**RAILWAY LABOR EXECUTIVES' AS-SOCIATION et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Interstate Commerce Commission, Southern Railway Company, and Central of Georgia Railway Company, Defendants.**

Civ. A. No. 3004.

United States District Court
E. D. Virginia,
at Alexandria.

Argued Dec. 4, 1963.

Decided Jan. 31, 1964.

William G. Mahoney, Washington, D. C. (William H. King and James L. Highsaw, Jr., Washington, D. C., on brief), for plaintiffs.

Leonard S. Goodman, Washington, D. C. (Robert W. Ginnane, Gen. Counsel of Interstate Commerce Commission, Thaddeus J. Harty, Jr., Washington, D. C., on brief), for defendant Interstate Commerce Commission.

William H. Orrick, Jr., Asst. Atty. Gen., Elliott H. Moyer, Atty., Dept. of Justice, Claude V. Spratley, Jr., U. S. Atty., Plato Cacheris, First Asst. U. S. Atty., for the United States of America.

Jack R. Turney, Jr., Washington, D. C. (Armistead L. Boothe, Alexandria, Va., W. Graham Claytor, Jr., William D. McLean and John B. Miller, Washington, D. C., on brief), for defendants Southern Railway Co. and Central of Georgia Railway Co.

Before BRYAN, Circuit Judge, and LEWIS and BUTZNER, District Judges.

LEWIS, District Judge.

This is an action brought by the Railway Labor Executives' Association to enjoin, set aside and annul, insofar as they relate to conditions for the benefit of employees, Reports and Orders of the Interstate Commerce Commission entered November 7, 1962, December 3, 1962, and June 10, 1963, in a proceeding entitled "Southern Railway—Control—Central of Georgia Railway Company, Finance Docket No. 21400," which approved, pursuant to Section 5(2) of the Interstate Commerce Act (49 U.S.C. § 5(2)), Southern's acquisition of stock control of Central.[1]

The plaintiff association is an unincorporated association with which are affiliated twenty-three standard railway labor organizations representing, under the Railway Labor Act (45 U.S.C.A. § 151 et seq.), the bulk of the nation's railway employees.

R.L.E.A., speaking for the "railroad employees affected," charges that the "conditions" imposed by the Commission in this case fall short of the minimum requirements of the second sentence of Section 5(2) (f) of the Interstate Commerce Act, and lack the "fairness and equity" provided for in the first sentence of the Act.

The Commission, in approving the transaction, was fully advised of the proposed consolidation of Central's freight agencies, yards, shops and accounting department into those of Southern, together with the resultant job losses entailing substantial hardship to many employees and their families. In the alleviation of these hardships the Commission imposed conditions[2] for the protection of the employees thus affected, which it determined more than met the statutory requirements of Section 5(2) (f) and would be fair and equitable.

The conditions thus imposed were formulated and adopted after extended discussion of the proposals advanced by the respective parties, and review of the conditions imposed by the Commission in approving other transactions.

Our jurisdiction as the statutory reviewing Court is limited to determining whether the Interstate Commerce Commission's Orders are legally valid.

---

1. The reports of the Commission are published in 317 I.C.C. 557 (1962) and in 317 I.C.C. 729 (1963).

2. The conditions imposed in this transaction are attached hereto as Appendix A.

Viewed in that light, the Orders complained of must be upheld and the complaint dismissed.

R.L.E.A. centers its attack upon the refusal of the Commission to impose conditions which would:

(a) Require proposed consolidation of facilities resulting from the transaction be with the consent of, or after arbitration with, representatives of employees of both carriers.

(b) Grant affected employees dismissal or displacement compensation upon refusal to accept carrier-offered employment involving a change of residence.

(c) Continue all former "fringe benefits" of dismissed employees notwithstanding their termination, for all retained employees on the home road.

(d) Grant employees an option of lump-sum separation payment in lieu of payments over the protection period.

Support for these proffered conditions is predicated upon R.L.E.A.'s interpretation of the word "employment" as it appears in the phrase "worse position with respect to their employment," in Section 5(2) (f), and upon their being incorporated in the "New Orleans" conditions. R.L.E.A. says the word "employment" includes: type of work performed—the place of work—and the seniority rights in the work.

The "Maintenance of Way" case [3] does not support them in that interpretation. To the contrary, the Supreme Court in that case cited with approval the opinion expressed by interested parties, including the affected Union, that "compensation protection for discharged employees was the intendment of § 5(2) (f)."

■ Subparagraph (f) [4] of paragraph 5(2) [5] requires that the Commission, in approving a transaction under that section, impose conditions which will be fair and equitable to the employees affected by the transaction, and provides that such transactions will not result in worsening employees' positions with respect to their employment during the four years following the effective date of the order or their period of service, whichever is less. "New Orleans" is nowhere mentioned therein. The Commission is free in its discretion to make different findings, to reach different conclusions, and to impose different conditions predicated upon its evaluation of the facts of record relating to each individual transaction, so long as it does not fail to meet the minimum statutory criteria and is fair and equitable.

Here, the Commission reviewed all of the conditions it had adopted in other transactions, and expressly modified the arbitration provisions embodied in the "Oklahoma" and "New Orleans" conditions before adopting the conditions im-

---

3. Brotherhood of Maintenance of Way Employees v. United States, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961).

4. "As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its ·or their employees."

5. 49 U.S.C. § 5(2).

posed in this case, and the record amply supports its conclusions.

■ Assuming, arguendo, says R.L. E.A., that the minimum requirements of the second sentence of Section 5(2) (f) have been met in this case, the Commission failed to meet the fair and equitable requirements of the first sentence of Section 5(2) (f) because it is neither fair nor equitable to remove from the conditions imposed, without reason, many of the protections which employees have so long enjoyed under the "Oklahoma" and "New Orleans" conditions. This contention is without merit. To hold otherwise would deprive the Commission of its statutory duty of imposing fair and equitable conditions predicated upon its evaluation of the facts of record relating to each individual transaction. We hold the conditions imposed in this case are fair and equitable and meet the minimum requirements of the statute.

The Southern, during the discussion of the proposed conditions, took the position that none of them should afford benefits to employees who may be adversely affected subsequent to the acquisition of control by reason of internal technological improvements and economies effected by Central, and requested the Commission to so hold. In refusing this request the Commission said:

"We may not by interpretation narrow the scope of the protection intended by the statute * * *. Questions as to whether adverse effects suffered by particular employees in their employment result from the transaction are questions of fact which can be determined under the circumstances of particular cases and must be left for the determination of the arbitrators in case of dispute."

Upon reconsideration the Commission, in its report of June 10, 1963, said:

"It is plain under the conditions that an employee would be entitled to benefits if adversely affected by a coordination of the operations of [Southern] and Central or by the shifting of functions from one to the other. However, the 'effect' of subsequent internal technological improvements by either of the carriers, even if made possible by improved financial circumstances partly attributable to the unification of control, is too indirect and remote to be considered a result of the transaction; and it is not our intention that employees affected by such internal improvements shall be entitled to the benefit of the conditions."

R.L.E.A. claims this is a complete reversal of the "law of the case" without reason,[6] and is an unlawful attempt on the part of the Commission to limit and restrict the protection afforded "affected employees" under Section 5(2) (f).

■ We need not determine the legality or propriety of the comments of the Commission thus made because that portion of its Order of November 7, 1962 was amended by the Commission in its Order of June 10, 1963. There the Commission held as a matter of law that certain adverse effects attributable to internal technological improvements create no liability under Section 5(2) (f). It did not limit or restrict the protection afforded "affected employees" under the statute. It only reserved for arbitration unsettled disputes resulting from the transaction. In so doing it was plainly right.

The subject matter to be submitted to arbitration under the condition here imposed[7] is crucial because the decision of the arbitration tribunal on all disputed factual and legal issues within the scope of the submission is final, binding and conclusive.

R.L.E.A. next attacks the failure of the Commission to impose conditions for the protection of the employees of Frisco,

---

6. The Commission had ample power to modify or change its Order of November 7th.

7. Condition 6, Appendix A.

particularly those employed in its Birmingham yard, upon the ground they are affected employees under the holding of this Court in Railway Labor Executives' Association et al. v. United States of America et al., D.C., 216 F.Supp. 101 (1963).

Our ruling in that case cannot be so construed. We there held:

"All 'employees affected' are under the aegis of the Act. The only question is whether they are 'affected.'"

The transaction in that case was the acquisition by Seaboard of the use of the Broad Street station. Here the transaction is Southern's acquisition of stock control of Central with the resultant consolidation of some of Central's facilities with those of Southern.

Frisco is a party to the transaction here under discussion only in the capacity of a beneficial owner of the Central stock, and the transaction will not unify ownership or control of its railroad operations with those of any other carrier.

The Commission found factually that the employees of Frisco are not employees who will be affected by its order within the meaning of Section 5(2) (f). This finding is amply supported by the record.

Frisco's Birmingham yard is manned by Frisco employees whose seniority rosters and interchangeable assignments are intermingled with other Frisco employees whose duties have nothing to do with the yard operation. Central's withdrawal from Frisco's Birmingham yard may have been an economical loss to Frisco and some of Frisco's employees may have been affected as a result thereof, but the withdrawal does not sufficiently touch the transaction here under discussion to warrant 5(2) (f) protection. Further, it could have been unilaterally accomplished at any time on six months' notice independent of Commission approval.

Other assaults of R.L.E.A. upon the Orders of the Commission are also rejected.

The complaint will be dismissed.

## Appendix A

### Conditions

### Article I

1. *Definitions.*—Whenever used in this article, unless the context requires otherwise, the words and phrases defined in this paragraph shall be deemed and construed to have the meanings herein set forth.

(a) "Transaction" means the transaction or transactions approved by the report of which this appendix is a part.

(b) "Carrier" means the railroad or railroads which are involved in the transaction, as defined or described in the said report.

(c) "Displaced employee" means an employee of a carrier who is placed in a worse position with respect to his compensation and rules governing his working conditions as a result of the transaction.

(d) "Dismissed employee" means an employee of a carrier who, as a result of the transaction, is deprived of employment with the carrier because of the abolition of his job or the loss thereof as the result of the exercise of seniority rights by an employee whose position is abolished as a result of the transaction.

(e) "Protective period" means that period of time from the date on which an employee is displaced or dismissed to the expiration of 4 years from the effective date of the order authorizing the transaction; *provided, however,* that the protective period for any particular employee shall not continue for a longer period following the effective date of said order than the period during which such employee was in the employ of the

carrier prior to the effective date of the order.

2. *Displacement allowances.*—(a) So long after his displacement as he is unable, in the exercise of his seniority rights under existing agreements, rules and practices, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, during the protective period a displaced employee shall be paid a monthly displacement allowance equal to the difference between the monthly compensation received by him in the position in which he is retained and the monthly compensation received by him in the position from which he was displaced; *provided, however,* that if any employee elects not to exercise his seniority rights he shall be entitled to no allowance.

(b) Each displacement allowance shall be determined by dividing separately by 12 the total compensation received by the employee and the total time for which he was paid during the last 12 months in which he performed services immediately preceding the date of his displacement as a result of the transaction, thereby producing average monthly compensation and average monthly time paid for in the test period.

(c) If his compensation in his retained position in any month is less than the aforesaid average compensation, the displaced employee shall be paid the difference, less compensation at the rate of the position from which he was displaced for time lost on account of his voluntary absences in his current or retained position, but if in his retained position he works in any month in excess of the average monthly time paid for in the test period, he shall be compensated for the excess time at the rate of pay of the retained position.

(d) Nothing herein contained shall operate to affect in any respect the retirement on pension or annuity rights and privileges in respect of any employee.

3. *Dismissal allowances.*—(a) A dismissed employee shall be paid a monthly dismissal allowance, from the date he is deprived of employment and continuing during the protective period, equivalent to one-twelfth of the compensation received by him in the last 12 months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of the transaction.

(b) The dismissal allowance of any dismissed employee who is otherwise employed shall be reduced to the extent that his combined monthly earnings in such other employment, any benefits received under any unemployment insurance law, and his dismissal allowance exceed the amount upon which his dismissal allowance is based. Such employee, or his representative, and the carriers, shall agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and of the benefits received.

(c) The dismissal allowance shall cease prior to the expiration of the protective period in the event of the failure of the employee without good cause to return to service after being notified by the carriers of a position, the duties of which he is qualified to perform and for

which he is eligible, or in the event of his resignation, death, retirement on pension, or dismissal for good cause.

4. *Fringe benefits.*—No employee of the carrier who is affected by the transaction shall be deprived during the protective period of benefits attached to his previous employment, such as free transportation, hospitalization, pensions, relief, et cetera, under the same conditions and so long as such benefits continue to be accorded to other employees on his home road, in active service or on furlough, as the case may be, to the extent that such benefits can be so maintained under present authority of law or corporate action or through future authorization which may be obtained.

5. *Moving expenses.*—Any employee retained in the service of the carrier or who is later restored to service after being entitled to receive a dismissal allowance, and who is required to change the point of his employment as a result of the transaction, and within the protective period is required to move his place of residence, shall be reimbursed for all expenses of moving his household and other personal effects, for the traveling expenses of himself and his immediate family, and for his own actual wage loss, not to exceed 2 days, the exact extent of the responsibility of the carrier to be agreed upon in advance by the carrier and the employee affected; provided, however, that changes in place of residence which are not a direct result of the transaction, made subsequent to the initial change and which grow out of the normal exercise of seniority, shall not be considered within the purview of this paragraph.

6. *Arbitration of disputes.*—In the event any dispute or controversy arises with respect to the protection afforded by these conditions or with respect to their interpretation, application, or enforcement, which cannot be settled by the carriers and the employee or his authorized representatives within 30 days after the dispute arises, it may be referred by either party to an arbitration committee for consideration and determination. Upon notice in writing served by one party on the other of intent by that party to refer the dispute or controversy to an arbitration committee, each party shall, within 10 days, select one member of the arbitration committee and the two members thus chosen shall select a third member who shall serve as chairman. Should the two members be unable to agree upon the appointment of the third member within 10 days, the parties shall then within an additional 10 days endeavor to agree to a method by which a third, or neutral, member shall be appointed, and, failing such agreement, either party may request the National Mediation Board to designate the third member, which designation when made will be binding upon the parties. The decision of the majority of the arbitration committee shall be final, binding, and conclusive. The salaries and expenses of the third member shall be borne equally by the parties to the proceeding and all other expenses shall be paid by the party incurring them.

7. *Losses from home removal.*—(a) The following condition shall apply, to the extent it is applicable in each instance, to any employee who is retained in the service of any of the carriers (or

who is later restored to service after being entitled to receive a dismissal allowance), who is required to change the point of his employment within the protective period as a result of the transaction and is therefore required to move his place of residence:

(i) If the employee owns his own home in the locality from which he is required to move, he shall at his option be reimbursed by his employing carrier for any loss suffered in the sale of his home for less than its fair value. In each case the fair value of the home in question shall be determined as of a date sufficiently prior to the date of filing of the application or applications here involved so as to be unaffected by such filing. The employing carrier shall in each instance be afforded an opportunity to purchase the home at such fair value before it is sold by the employee to any other person.

(ii) If the employee is under a contract to purchase his home, the employing carrier shall protect him against loss to the extent of the fair value of any equity he may have in the home and in addition shall relieve him from any further obligation under his contract.

(iii) If the employee holds an unexpired lease of a dwelling occupied by him as his home, the employing carrier shall protect him from all loss and cost in securing the cancellation of his said lease.

(b) Changes in place of residence subsequent to an initial change caused by the consummation of the transaction and which grow out of the normal exercise of seniority in accordance with working agreements are not comprehended within the provisions of this condition.

(c) No claim for loss shall be paid under the provisions of this condition which is not presented within 1 year after the date the employee is required to move.

(d) Should a controversy arise in respect to the value of the home, the loss sustained in its sale, the loss under a contract for purchase, loss and cost in securing termination of a lease, or any other question in connection with these matters, it shall be decided through joint conference between the representatives of the employees and the carrier on whose line the controversy arises and in the event they are unable to agree, the dispute or controversy may be referred by either party to a board of three competent real estate appraisers, selected in the following manner: One to be selected by the representatives of the employees and one by the carrier, and these two shall endeavor by agreement within 10 days after their appointment to select the third appraiser. A decision of a majority of the appraisers shall be required and said decision shall be final and conclusive. The salary and expenses of the third or neutral appraiser, including the expenses of the appraisal board, shall be borne equally by the parties to the proceedings. All other expenses shall be paid by the party incurring them, including the compensation of the appraiser selected by such party.

Article II

1. Any employee adversely affected as a result of the transaction, within 4 years from the effective date of the order approving the transaction, shall receive as a minimum the protection afforded

by Article I hereof for the period he is adversely affected prior to the expiration of 4 years from the effective date of the order of approval, and any such employee so adversely affected who has received under such conditions total dismissal or displacement compensation less than that which he would receive by applying the Washington Agreement of May 21, 1936, as limited by paragraph 2 of this article, for the full protective period therein provided from the time he is first adversely affected, shall continue to receive benefits under the terms of the Washington Agreement, as limited, until the total compensatory benefits provided therein for the particular period of service have been paid.

2. In applying the Washington Agreement the coordination allowance provided therein for dismissed employees shall be reduced with respect to any employee who is otherwise employed to the extent that his combined monthly earnings in such other employment, any benefits received under any unemployment insurance law, and his coordination allowance, exceed the amount upon which his coordination allowance is based; such employee or his representative, and the carriers, to agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and the benefits received.

3. Any dispute or controversy which may arise with respect to the additional benefits provided by this Article II shall be settled in the same manner as provided in paragraph 6 of Article I hereof in relation to disputes arising under the latter article.