See also 5 Cir., 341 F.2d 217.

SWITCHMEN'S UNION OF NORTH AMERICA, Appellant,

v.

CENTRAL OF GEORGIA RAILWAY COMPANY and Southern Railway Company, Appellees.

BROTHERHOOD OF LOCOMOTIVE EN- GINEERS et al., Appellants,

v.

CENTRAL OF GEORGIA RAILWAY COMPANY, Appellee.

No. 21016.

United States Court of Appeals Fifth Circuit.

Feb. 2, 1965.

On Petition for Rehearing March 5, 1965.

Ralph L. Crawford, Savannah, Ga., Harold C. Heiss, Cleveland, Ohio, George D. Busbee, Albany, Ga., E. S. Sell, Jr., Macon, Ga., John R. Calhoun, Savannah, Ga., Russell B. Day, Cleveland, Ohio, (Divine & Busbee, Albany, Ga., Sell & Comer, Macon, Ga., Heiss, Day & Bennett, Cleveland, Ohio, of counsel), for appellants.

John B. Miller, Savannah, Ga., Charles J. Bloch, Macon, Ga., Julian C. Sipple, Savannah, Ga., B. D. Murphy, Edgar A. Neely, Jr., Atlanta, Ga., Ellsworth Hall, Jr., Macon, Ga., (W. Graham Claytor, Jr., Covington & Burling, Washington, D. C., of counsel), for appellees.

Before TUTTLE, Chief Judge, BELL, Circuit Judge, and WHITEHURST, District Judge.

TUTTLE, Chief Judge.

This appeal, while consolidated by the district court, really consists of three separate law suits, two of which, BLE and BLF&E v. Central of Georgia Railway Company, differ so materially from the third, Switchmen's Union v. Central of Georgia and Southern Railway Company, that the cases must be considered separately.

The two Brotherhood suits were filed simultaneously in the Middle District of Georgia against the Central of Georgia Railway Company alone. The complaints in those two cases simply alleged that at a time when a subsisting agreement was in effect between the Central of Georgia and its two groups of employees as to which the Brotherhoods were the bargaining representatives, the Central of Georgia unilaterally transferred all of its employees in certain yards from the Central of Georgia payroll to the payroll of the Southern Railway Company; that this changed rates of pay, rules and working conditions of its employees without compliance with Section 156 of Title 45 U.S.C.A. to the irreparable damage of the employees and that such conduct should be enjoined.

The Switchmen's Union complaint, brought, as noted above, against both Central of Georgia and Southern Railway Companies upon alleging similar facts, also relied on allegations that the two railroad companies were purporting to act by reason of an Interstate Commerce Commission order authorizing the purchase of controlling stock in the Central by the Southern; and that the order of the Interstate Commerce Commission did not authorize a consolidation of the several yards involved; that under an existing labor agreement known as "the Washington Agreement" no such consolidation could be undertaken except upon 90 days notice and an opportunity by the respective Brotherhoods to negotiate with relation to the employment conditions arising from such consolidation; that the attempted consolidation without compliance with the terms of the Washington Agreement violated the terms of the Interstate Commerce Commission order authorizing the acquisition of control by the Southern, thus giving a right to the affected employees to an injunction to maintain the status quo until the provisions of the Washington Agreement.

dealing with the 90 day notice were complied with.

By reason of the fact that the Supreme Court has recently assumed jurisdiction in an appeal from a judgment by a three-judge district court in the Eastern District of Virginia, dealing with the same Interstate Commerce Commission order here pleaded in the suit filed by the Switchmen's Union, as a result of which the Supreme Court has directed the three-judge district court to remand to the Interstate Commerce Commission its said order with directions that the Commission "amend its report and order as necessary to deal with appellant's request that §§ 4, 5, and 9 be included as protective conditions, specifically indicating why each of these provisions is either omitted or included," Railway Labor Executives Assn. v. United States, 85 S.Ct. 307, we think it premature for this Court to pass upon the appeal in the Switchmen's Union case. The correctness of the trial court's determination in that case may well be determined by the action of the Interstate Commerce Commission in response to the expected mandate just referred to, and the further orders of the district court and possibly the Supreme Court thereafter.

In view of the fact that the Brotherhood cases against Central of Georgia, here on appeal, in no way relate to the Washington Agreement we deem it appropriate to deal with the appeal in that case, even though in doing so we have to consider the Interstate Commerce order which we have heretofore referred to. This order, entered upon the application of the Southern Railway System, authorized the Southern to acquire the controlling stock of Central. This occurred in a proceeding entitled "Southern Railway—Control—Central of Georgia Railway Company, Finance Docket No. 21,-400, 317 I.C.C. 557 and 317 I.C.C. 729". This order of the Interstate Commerce Commission becomes significant in this case because, although not pleaded by the appellant Brotherhoods in their complaints, it was introduced in evidence in support of a motion to dismiss by the Central of Georgia and the order of the trial court dismissing the complaints may be taken as orders of dismissal on motion for summary judgment in accordance with Federal Rules of Civil Procedure, Rule No. 12(b).

The appellee, Central of Georgia Railway Company, defends its conduct in transferring its employees in the several yards in question to the Southern Railway Company on the ground that this was authorized by the I.C.C. order itself. It is contended that this amounted simply to a termination by Central of unneeded employees accompanied by an offer to them of employment by Southern. Thus, it was argued, Central was not guilty of changing the terms of any existing agreement with respect to rates of pay, rules or working conditions as prohibited without a Section 6 notice by the Railway Labor Act, but was merely dispensing with the services of unneeded employees.

A resolution of this appeal depends upon the correct solution of two questions. (1) Did the order of Interstate Commerce Commission authorize the consolidation or coordination of facilities which resulted in the termination of the employment of the Central employees; (2) If the order authorized this consolidation or coordination, did the termination violate Section 6 of the Railway Labor Act prohibiting unilateral change in "agreements affecting rates of pay, rules or working conditions" except upon notice and opportunity to negotiate with ultimate recourse to the Mediation Board?

As to the first question, the brief of the appellees offers us little help. Having treated all cases alike, the briefs do not discuss the precise question whether the Interstate Commerce order, which on its face purports only to grant the right to Southern Railway Company to acquire the stock, and thus the control of Central of Georgia Railway Company, also permits the consolidation of yards belonging to the two related companies. Nevertheless viewing the language of the I.C.C. report upon which the order is based, we conclude that the order author-

ized the Central to surrender its yards, and the operation thereof, to the parent company the Southern Railway Company. This action was clearly contemplated by all parties to the Interstate Commerce proceedings under the heading "Employees." In the report it is stated,

> "Applicant [Southern Railway Company] estimates that the proposed consolidation of Central's freight agencies, yards, shops, and accounting department into those of applicant will result in the elimination of between 814 and 824 jobs held by Central employees and 4 held by applicant's employees. * *

> "Consummation of the proposed transaction unquestionably will result in substantial hardship to many employees and their families. However, we are not persuaded that the application should be denied for this reason. While the number of available jobs will be reduced, at least temporarily, the remaining jobs will be made more secure. In this connection, it is noteworthy that, without any coordination such as that planned, the average number of persons employed by Central has been reduced from 6,737 in 1945 to 3,421 in 1960. The future of all the employees of Central is far from bright unless this trend can be arrested. Affiliation of Central with applicant will strengthen its ability to render adequate and efficient service and to continue its operations on a sound financial basis. Some such affiliation appears necessary to avoid further deterioration in its earnings and competitive position and, possibly, insolvency."

In light of the foregoing language which clearly contemplates "coordination," a word well understood in the industry as involving the merging of facilities, see Section 2(a) Washington Agreement, we conclude that the first question must be answered in the affirmative. The order authorizing the Southern to acquire control of the Central authorized this consolidation or coordination of yards that brought about the notice of termination which the Brotherhoods here complain of.

■ As this Court has noted in St. Louis, San Francisco & Texas Rwy. Co. v. Railroad Yardmasters of America, AFL–CIO, 5 Cir., 328 F.2d 749, it does not follow that every time a carrier takes unilateral action that may affect "rates of pay, rules or working conditions" then Section 6 must be invoked on the theory that the carrier is thus intending to affect a "change in agreements affecting rates of pay, rules or working conditions" which the parties here both agree can be accomplished only in the manner provided under Section 6 of the Act. The Central of Georgia Railway does not purport to and has not suggested an intention to make, a "change in *agreements* affecting rates of pay, rules or working conditions." (Emphasis added)

■■ Relying, whether correctly or mistakenly, on the fact that a large number of jobs are no longer needed to be performed by its employees in light of the consolidation of facilities with the Southern and the assumption of the operations by the Southern it has, by bulletin, notified the affected employees that their services are no longer needed by it, but that they may be employed by the Southern in several capacities. If this conduct by the Central of Georgia is in violation of existing agreements, it can be contested under the provisions of the Railway Labor Act by following the grievance procedures to the Railway Adjustment Board as in the processing of a "minor" dispute. As we stated in St. Louis, SF & T Rwy. Co. v. Railroad Yardmasters, supra, "In such a case a suit may not be filed in the courts until after the procedures provided for under the Act are complied with." 328 F.2d 749, 752.

Although the district court's order of dismissal stressed the pendency of the three-judge case in the Eastern District of Virginia as the principal reason for denying relief here, and the issues before the court with respect to this Brotherhood appeal are not in any way affected

by that case, the order of the trial court dismissing these complaints was nevertheless correct for the reasons we have stated. To summarize, we find that the Interstate Commerce Commission order of June 10th authorized the consolidation of the facilities of the Central of Georgia with the Southern, thus bringing about a reduction in force by the Central of Georgia; if such reduction in force violated any existing agreements between the Brotherhoods and the Central of Georgia, relief in such event would be by grievance procedures in the processing of a "minor" dispute under the Railway Labor Act. A violation of such agreements would not entitle the Brotherhoods to file a suit either for injunction or damages until such dispute had been fully processed and disposed of. The judgment of the trial court dismissing the two Brotherhood suits must be affirmed.

No final disposition can be made of the appeal of Switchmen's Union v. Central of Georgia and Southern Railway Company because the basis of their attack in the trial court is the Washington Agreement. In the three-judge district court they, as well as the Brotherhoods in the companion case which we dispose of in similar fashion today, Brotherhood of Railway and Steamship Clerks, et al. v. Southern Railway Company and Central of Georgia Railway Company, No. 21023, filed suit to restrain the enforcement, operation or execution of the I.C.C. order by requiring the inclusion in the order of Sections 4, 5 and 9 of the Washington Agreement. The trial court declined to require such modification, Railway Labor Executives' Assn. v. United States, D.C., 226 F.Supp. 521. The Supreme Court, as stated above, vacated the order and remanded the case to the district court directing that it be sent back to the Commission for further consideration of these provisions of the Washington Agreement. Since, therefore, the order here litigated has been remanded to the Commission for further consideration it would be inappropriate for this Court to proceed further in the matter until full effect has been given to the Supreme Court's mandate. Since the issues remaining in the case following further action by the Commission should first be submitted to the trial court for its consideration, we vacate the judgment of dismissal in the Switchmen's Union case and remand it to the trial court for further proceedings not inconsistent with this opinion.

## ON PETITION FOR REHEARING

### PER CURIAM:

This petition for rehearing and motion for stay of the mandate presents nothing that was not contained in the original briefs of the appellants. The filing of such a motion is wholly unjustified.

The petition and motion are denied.