MISSOURI–KANSAS–TEXAS
RAILROAD COMPANY,
Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondent.

RAILWAY LABOR EXECUTIVES'
ASSOCIATION, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

PEOPLE OF the STATE OF ILLINOIS,
Illinois Commerce Commission, Patrick
W. Simmons and M. S. Stuckey, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of
America, Respondents.

Nos. 80–1523, 80–1563 and 80–1692.

United States Court of Appeals,
Fifth Circuit.

Nov. 24, 1980.

Robert L. Redfearn, Brian, Simon, Peragine, Smith & Redfearn, New Orleans, La., Arthur J. Cerra, Stinson, Mag & Fizzell, Kansas City, Mo., for Board of Trade of Kansas City, Mo., Inc.

Benjamin Civiletti, Atty. Gen., Barry Grossman, James H. Laskey, Dept. of Justice, Washington, D.C., for United States of America.

Henri F. Rush, Richard A. Allen, Denise O'Brien, Louis E. Gitomer, Lawrence H. Richmond, I.C.C., Washington, D.C., for Interstate Commerce Commission.

Martin M. Lucente, Christian L. Campbell, Sidley & Austin, Chicago, Ill., John F. Whitney, Paul M. Haygood, New Orleans, La., G. Paul Moates, Washington, D.C., for Burlington Northern & St. Louis–San Francisco.

Highsaw, Mahoney & Friedman, P. C., John O'Brien Clarke, Jr., Washington, D.C., Barker, Boudreaux, Lang, Gardner & Foley, New Orleans, La., for RLEA.

William A. Thie, Dallas, Tex., Harry G. Silleck, Jr., New York City, Gerard M. Dillon, New Orleans, La., for Missouri–Kansas–Texas R. Co.

C. H. Peterson, Minneapolis, Minn., for Soo Line R.R. Co.

William J. Scott, Atty. Gen., Hercules F. Bolos, James E. Weging, Chicago, Ill., Gordon P. MacDougall, Washington, D.C., for People of the State of Illinois, et al.

Before THORNBERRY, GEE and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

In late 1977 Burlington Northern, Inc. (BN) and the St. Louis–San Francisco Railway Company (Frisco) applied to the Interstate Commerce Commission (ICC or the Commission) for authorization to merge pursuant to 49 U.S.C. §§ 11343 and 11344.[1]

1. Section 11343 states, in pertinent part:

(a) The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may be carried out only with the approval and authorization of the Commission:

(1) consolidation or merger of the properties or franchises of at least 2 carriers into one corporation for the ownership, management, and operation of the previously separately owned properties.

Section 11344 states, in pertinent part:

(a) The Interstate Commerce Commission may begin a proceeding to approve and authorize a transaction referred to in section 11343 of this title on application of the person seeking that authority....

(b) In a proceeding under this section, the Commission shall consider at least the following:

(1) the effect of the proposed transaction on the adequacy of transportation to the public.

(2) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.

(3) the total fixed charges that result from the proposed transaction.

(4) the interest of carrier employees affected by the proposed transaction.

The Commission authorized the merger in a decision rendered in March 1980. No party to the proceeding sought administrative review. Instead, several of the protesting parties filed petitions in this court for judicial review of the Commission's decision,[2] and BN and Frisco intervened as respondents. The appellants challenge the Commission's standard of the "public interest," the existence of substantial evidence supporting certain projections, two new policy announcements, and a statutory interpretation regarding the scope of required employee protection. We have stayed the merger pending appeal, but we now affirm the Commission's decision.

## I. *Statutory Provisions for Railroad Mergers*

The Interstate Commerce Act (ICA or the Act) requires that the merger of railroads subject to the jurisdiction of the ICC may be accomplished only with the approval and authorization of the Commission. 49 U.S.C. § 11343. The Act's single and essential standard of approval is that the Commission find the merger to be "consistent with the public interest." 49 U.S.C. § 11344(c). The Commission is required to consider at least the following factors in a merger approval proceeding:

(1) the effect of the proposed transaction on the adequacy of transportation to the public.

(2) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.

(3) the total fixed charges that result from the proposed transaction.

(c) The Commission shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest. The Commission may impose conditions governing the transaction.... When a rail carrier is involved in the transaction, the Commission may require inclusion of other rail carriers located in the area involved in the transaction if they apply for inclusion and the Commission finds their inclusion to be consistent with the public interest.

**2.** The Missouri–Kansas–Texas Railroad Company and the Railway Labor Executives' Asso-

(4) the interest of carrier employees affected by the proposed transaction.

49 U.S.C. § 11344(b).

■ The Commission must also consider as an element of "the public interest" the anticompetitive effects of a proposed merger, because § 11343[3] of the Act exempts transactions approved by the Commission from the antitrust laws. *United States v. ICC*, 396 U.S. 491, 504, 90 S.Ct. 708, 714, 24 L.Ed.2d 700 (1970). When the Commission finds that a merger meets the "public interest" standard, it must approve the transaction. The Commission may, however, impose any conditions upon the merger that it wishes. 49 U.S.C. § 11344(c). These conditions may effectively re–distribute the merger's benefits to bring it within the public interest or enhance the degree to which the public interest is served, consistent with the relevant requirements of the Act.

The flexible procedure and standard that Congress provided in §§ 11343 and 11344 of the Act allow the Commission to adapt its policies and practices to the ever–changing transportation needs of the public. But Congress has also enacted broad policy guidelines for the Commission, which it is required to consider in its task of identifying the public interest. *McLean Trucking Co. v. United States*, 321 U.S. 67, 82, 64 S.Ct. 370, 378, 88 L.Ed. 544 (1944). One is the national transportation policy, which says, in part:

> ... [I]t is the policy of the United States Government to provide for the impartial

ciation filed the original petition for review. The Soo Line Railroad Company and the Kansas City Board of Trade intervened as petitioners. A group of parties, to be designated as the "Illinois parties" herein, also jointly intervened: the People of the State of Illinois; the Illinois Commerce Commission; Patrick W. Simmons, Illinois Legislative Director of the United Transportation Union; and M. S. Stuckey, General Chairman for the United Transportation Union of Illinois Central Gulf Railroad.

**3.** Section 11343 was originally § 5(11) of the Act, which was recodified by Pub.L.No. 95–473, 92 Stat. 1337 (enacted October 17, 1978).

regulation of the modes of transportation subject to this subtitle, and in regulating those modes–

(1) to recognize and preserve the inherent advantage of each mode of transportation;

(2) to promote safe, adequate, economical, and efficient transportation;

(3) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(4) to encourage the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices;

(5) to cooperate with each State and the officials of each State on transportation matters; and

(6) to encourage fair wages and working conditions in the transportation industry.

49 U.S.C. § 10101. Congress provided another policy guideline in the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act), in which Congress declared its purpose to encourage "efforts to restructure the [railway system of the United States] on a more economically justified basis ...." 45 U.S.C. § 801. The legislative history of the 4R Act specifically states that it is "intended to encourage mergers, consolidations, and joint use of facilities that tend to rationalize and improve the Nation's rail system." S.Rep. No. 94–499, 94th Cong., 1st Sess. 20 (1975), Section

101(a)(2) and 101(b)(2), reprinted in [1976] U.S. Code Cong. & Admin. News, pp. 14, 34. Within these statutory standards and policies set forth by Congress, it is the unique task of the Commission to identify the specific factors, and their proper balance, that best serve the public interest as it changes through the years.[4]

## II. *Parties to the Commission Proceeding and this Appeal*

Because the parties before the Commission and before us are numerous, we will briefly identify them and the roles they play.

### A. *The Merging Railroads*

Burlington Northern is a diversified transportation and natural resources company that is the largest railroad system in the United States in terms of miles, and the second largest in terms of transportation revenues. The principal lines of BN's 25,000 mile system extend east from Seattle and Portland to Montana, where two branches continue to Chicago. Through two subsidiaries, BN also serves Denver, Dallas–Fort Worth, and Galveston. Since 1970 BN has compiled a good traffic and revenue growth record. Net railway revenues in 1976[5] were about $72.6 million.

Frisco, the railroad to be absorbed into BN, has about one–fifth the track mileage of BN. Operating mainly as a link between other carriers, Frisco provides service from St. Louis and Kansas City to Wichita, Mem-

---

4. The Commission has chosen to announce the criteria, other than those set out by Congress, that it currently considers in determining whether a proposed railroad merger satisfies the public interest standard:

(1) Whether essential rail services will continue to be provided, either by the consolidating companies or by other railroads which may be affected by the consolidation ("essential services" include, but are not limited to, those required by the national defense and those shown necessary to achieve other established national goals, such as energy conservation and rural and community development);

(2) Whether opportunities to achieve operating efficiencies will be increased;

(3) Whether redundant facilities will be eliminated;

(4) Whether the ability of the consolidated system to attract new business will be enhanced;

(5) Whether the consolidated company will be financially viable;

(6) Whether effective inter-and intramodal competition will be maintained wherever economic realities make it possible; and

(7) Whether there will by any adverse impact on the environment of the region served.

Railroad Consolidation Procedures, 359 I.C.C. 195, 199 (1978).

5. Comparisons of railroad revenues will be based on 1976 figures, the most recent year available at the time data was assembled for the ICC in 1977 and 1978.

phis, Birmingham, and Pensacola. It also runs from Springfield, Missouri through Kansas and Oklahoma to Dallas–Fort Worth. Frisco connects with BN subsidiaries at four points in Texas: Dallas, Fort Worth, Irving, and Quanah. Frisco's net income in 1976 was $12 million.

Because BN and Frisco are not competitors on parallel routes, their proposed merger is of an "end–to–end" form, greatly extending for both railroads the markets they can reach, for which they may then offer more efficient service and lower "single–line" rates. Other operating efficiencies and innovations made possible by the merger would enable the merged railroad to achieve net revenue gains of about $33 million a year, including traffic diversions from competitors of about $16.8 million.

### B. *Protesting Railroads and Other Parties*

The railroad that will probably face the greatest challenge in dealing with increased competition from the merged BN–Frisco is the Missouri–Kansas–Texas Railroad Company (Katy). Katy serves Missouri, Kansas, Oklahoma, and Texas, with its main lines running south from Kansas City and St. Louis through Dallas–Fort Worth to San Antonio and Houston. Katy's traffic volume and operations have changed little since the 1950's, and its net income of $2.4 million in 1978 was only the second significant income for the railroad in nearly 75 years. Katy acknowledges, however, that it has begun to "turn the corner" as a result of improving business in its territory and a substantial rehabilitation of its facilities aided by $38 million in federal funds.

The Soo Line Railroad Company (Soo) operates 4,600 miles of railroad in Montana, North and South Dakota, Minnesota, Michigan, Wisconsin, and Illinois. These routes place Soo in direct competition with BN. Soo is an economically strong carrier, and had a net income of almost $19 million in 1976.

The non–carrier appellants are as follows: (1) the Railway Labor Executives'

Association (RLEA), a voluntary, unincorporated association of the chief executive officers of most of the nation's rail labor organizations; (2) the Kansas City Board of Trade (KCBOT); and (3) a group of joint intervenors representing Illinois interests (Illinois parties).[6]

### III. *I.C.C. Proceedings and Opinion*

BN and Frisco filed their merger proposal with the ICC in late December 1977. The Commission accepted the filing in January 1978 and waived an initial decision by the administrative law judge. 43 F.R. 3799 (1978). Thus the merits of the applications were determined by the Commission itself, as provided by statute when an application "is of major transportation importance." 49 U.S.C. § 11345(e).

Public hearings were conducted before an administrative law judge from May 1978 through June 1979. In October 1979 the administrative law judge closed the record and certified it to the ICC. The Commission heard oral argument on November 14, 1979. The total record reflects 46 days of hearings and comprises 8,370 pages of transcript and 222 exhibits received in evidence.

The Commission released its opinion on April 17, 1980, authorizing the merger subject to specified conditions. Burlington Northern, Inc.–Control and Merger–St. Louis–San Francisco Ry. Co., 360 I.C.C. 784 (1980). Because the opinion is the essential subject of this judicial review, it is necessary to outline its contents in some detail.

The Commission first discussed the two applicant railroads and the terms of the proposed merger. The opinion set out the impact and benefits of the merger as projected by the applicants in each of ten major areas: diversion of traffic and revenues from other carriers, increased costs, changes in operations, savings in purchasing and materials, benefits to shippers and the general public, securities transactions, impact upon employees of the applicants, impact upon national defense, overall financial consequences, and environmental impact. 360 I.C.C. at 805–32, 945–46. These analy-

---

**6.** The Illinois parties are identified in note 2.

ses were based upon extensive data that the Commission requires all merger applicants to prepare. 49 C.F.R. §§ 1111.1–.3.

The Commission next analyzed in detail the positions of all other parties to the proceeding. Ten competitor railroads of BN and Frisco had negotiated protective conditions with the merger applicants and informed the Commission that they would not oppose the merger if the stipulated conditions were imposed. In addition to Katy and Soo, four other railroads opposed the merger,[7] but these four carriers chose not to appeal the Commission's decision to this court. The remaining parties opposed to the merger were the RLEA and the KCBOT–both petitioners in this appeal–and six other public and private parties who did not join the appeal.[8]

The two most significant non–carrier parties in favor of the merger were the Department of Defense and the Department of Justice. The Department of Justice stated that it found no significant anticompetitive effects from the merger, based upon the extensive analysis of projected traffic and revenue diversions. The Department noted that all of the competitor railroads could survive the diversions without serious damage to their operations or financial stability, with the possible exception of Katy. The Department concluded, with a marked lack of sentimentality, that Katy could restructure if it did not survive and, in any event, Katy's presence would not be missed in the competitive climate of its service areas. 360 I.C.C. at 917–20.

Having closely reviewed and analyzed the positions of all the parties, the Commission reviewed the criteria of merger approval contained in the relevant statutes and in the Commission's own policy statements.[9] The opinion then analyzed specific findings and conclusions about the benefits to the public from the proposed merger. The Commission found that the BN–Frisco merger was very strongly in the public interest. The merged BN–Frisco will be able to provide new single–line service between the Southeast and Northwest, reduce transit times, provide more frequent and efficient service, and greatly improve car utilization. The improved service will stimulate innovative rates and service improvements among other carriers. No competing carrier will be so adversely affected that it could not continue to provide "essential services" to the public. 360 I.C.C. at 934–41.

Katy, Soo, and the four other protesting carriers had asked the Commission to impose special protective conditions on the merger that would relieve them from the impact of the increased competition or improve their competitive position.[10] The Commission denied all requests for special protective conditions, but did impose on the merger for a period of two years the set of standard traffic protection conditions, known as "D.T. & I conditions,"[11] that have been imposed on nearly every railroad merger in the last 30 years. The D.T. & I. conditions generally ensure that a merged railroad will (1) continue to handle the interconnecting traffic of other railroads with the same neutrality as before the merger and not favor its new partner at the expense of a non–merged railroad, and (2) not

---

7. The four railroads were the Chicago, Rock Island and Pacific Railroad Company; the Chicago, Milwaukee, St. Paul and Pacific Railroad Company; the Illinois Central Gulf Railroad Company; and the Denver and Rio Grande Western Railroad Company.

8. These public and private parties were the Iowa Department of Transportation, the Illinois Department of Transportation, the Montana Wheat Research and Marketing Committee, John W. O'Neil (representing Frisco shareholders), the United Transportation Union, and the Railway Employees' Department of the AFL–CIO.

9. See the discussion set out in section I. above.

10. Soo, for instance, made extensive requests for the opening of new connections with the merged BN–Frisco, new trackage rights over BN-Frisco tracks without payment of any rent by Soo, termination of a 1929 pooling agreement between Soo and BN's predecessor company, and six other special conditions.

11. The name is taken from the first case in which the Commission imposed this set of protective conditions, Detroit, Toledo & Ironton R.R. Co.–Control, 275 I.C.C. 455 (1950).

close routes or rates previously maintained with a competing railroad without the Commission's approval.[12] The Commission also imposed upon BN and Frisco for two years the conditions that they had negotiated and stipulated with the ten non–objecting railroads. 360 I.C.C. at 950–58, 1179–80.

The order approving the merger subject to these conditions was to become effective 30 days from the date of its service. BN and Frisco announced their intention to consummate the merger on May 19, 1980. Katy and the RLEA, subsequently joined by the other petitioners, sought review in this court and asked the Commission to stay its order pending judicial review. The Commission refused. This court imposed a stay, however, and set the case for expedited briefing and argument. Petitions by BN and Frisco to vacate the stay were denied by this court and by the United States Supreme Court. *Burlington Northern, Inc. v. Missouri–Kansas–Texas Railroad,* —— U.S. ——, 100 S.Ct. 3007, 65 L.Ed.2d 1110 (1980).

### IV. *Issues on Appeal*

None of the petitioners directly challenge the Commission's ultimate conclusion that the BN–Frisco merger is in the public interest. The validity of that conclusion is threatened only indirectly, by challenges to subsidiary findings, conclusions, and orders of the Commission. The six issues raised by the parties are as follows:

1) Did the Commission apply a proper statutory standard in looking to the preservation of "essential rail services" rather than the preservation of corporate entities?

2) Did the Commission's limitation of D.T. & I. conditions to two years nullify the substantial evidence supporting any other finding or conclusion?

3) Did the Commission err in denying the special protective conditions sought by Katy and Soo?

4) Was it arbitrary and capricious and an abuse of discretion for the Commission to announce and apply in this case its new policy determination that (1) indemnification of competitor railroads is not a viable condition "under any circumstances" and (2) a carrier will not be granted any protective condition that it did not request?

5) Did the Commission give adequate consideration to the anticompetitive effects of the merger, especially in encouraging other mergers?

6) Did the Commission properly hold that the Interstate Commerce Act only requires it to consider protection for employees of the merging carriers, and not for employees of other carriers?

### V. *The Standard of Judicial Review*

 The Administrative Procedure Act, 5 U.S.C. § 706, governs the scope of our review of an agency decision. We are directed to

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or]

(E) unsupported by substantial evidence ...."

"Substantial evidence" means "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Illinois Central Railroad v. Norfolk & Western Railway,* 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966).

The APA and the Interstate Commerce Act are integral parts of a congressional intent that the Commission use its extensive facilities, broad experience, and expert judgment to make the complex decisions necessary to evaluate whether a railroad merger is consistent with the public interest. It is not our task to re–weigh the

---

**12.** The D.T. & I. conditions prohibit both direct and "commercial" closing of routes and rates. For instance, if carrier A negotiates an interline rate with carrier B, and then carrier A and carrier C merge, A and C cannot close B's interline rate, nor can they offer a lower rate (a "commercial closing") without offering the same rate to carrier B or gaining Commission approval.

evidence or to draw our own inferences from the evidence before the Commission. *Chicago, St. Paul, Minneapolis & Omaha Railway v. United States*, 322 U.S. 1, 3, 64 S.Ct. 842, 843, 88 L.Ed. 1093 (1944). We can ask only whether the Commission has observed the statutory limits that Congress has set for its discretion, whether its action was arbitrary or capricious, or whether its findings are supported by adequate analysis and substantial evidence in the record considered as a whole. *McLean Trucking Co.*, 321 U.S. at 87–88, 64 S.Ct. at 381. If a Commission action meets these broad standards, then our task is at an end.

### VI. *Discussion of the Issues Raised*

#### 1. *The "Essential Services" Standard*

■ The Commission's fundamental task under § 11344 is to decide whether a merger is "consistent with the public interest." One of the most difficult decisions of the Commission is the degree to which the benefits for the merging railroads should be diminished through the device of protective conditions in order to insulate weaker competitors. In prior years the Commission believed that the preservation of service in general, and of the corporations providing that service in particular, was an end that justified protective conditions for weaker carriers. Consequently, the Commission would impose conditions on a merger merely to protect the market shares of competing carriers,[13] to compensate a carrier for anticipated losses,[14] to improve the position

of a carrier,[15] or to aid carriers even though they were not likely to be harmed by the subject merger.[16]

The Commission has begun to move away from this liberal use of protective conditions, perhaps in response to the growing public consensus that the transportation industry should be shaped more by the realities of the marketplace and less by government regulation—as shown by recent congressional deregulation of the airline,[17] trucking,[18] and railroad industries.[19] The Commission's re–evaluation of policy began as early as February 1977, when the Commission directed its Rail Services Planning Office (RSPO) to conduct a nationwide study of railroad mergers, prompted by a recognition that the 4R Act had expressed Congress' intent to encourage railroad consolidation.[20]

After a preliminary report and public hearings, the RSPO issued its Final Report in February 1978. The report recommended that the Commission adopt a policy that it would no longer impose conditions on a merger merely to preserve weak carriers, but only to preserve *essential* services to the public, regardless of who provides them. Rail Merger Study–Final Report (Rail Services Planning Office) (February 1, 1978), pp. 38–39.

The Commission formulated a policy statement based upon the RSPO recommendation, published it in proposed form, 43 Fed.Reg. 15753, and released its final policy in Railroad Consolidation Procedures,

---

13. *See, e.g.*, Chicago & North Western Ry.–Control–Chicago, Rock Island & Pacific R.R., 347 I.C.C. 556 (1974); Illinois Central Gulf R.R.–Acquisition–Gulf, Mobile & Ohio R.R., Illinois Central R.R., 338 I.C.C. 805 (1971); Pennsylvania R.R., 327 I.C.C. 475 (1966).

14. Chicago & North Western Ry., 347 I.C.C. 556 (1974).

15. Great Northern Pac.–Merger–Great Northern, 331 I.C.C. 228, 280–81 (1967).

16. Louisville & N.R.R.–Merger–Monon Railroad, 338 I.C.C. 134 (1970).

17. Airline Deregulation Act of 1978, Pub.L.No. 95- 504, 92 Stat. 1705 (1978).

18. Motor Carrier Act of 1980, Pub.L.No. 96–296, 94 Stat. 793 (1980).

19. Staggers Rail Act of 1980, Pub.L.No. 96–448, 94 Stat. 1895 (1980).

We have reviewed the present case under existing law prior to the October 1, 1980 effective date of § 228 of the Staggers Rail Act of 1980. *See* Report of the Committee on Conference, H.R. Rep. No. 96–1430, 96th Cong., 2d Sess. 142 (1980). That statutory change, however, would have no effect on our conclusions.

20. See the discussion at the end of section I. above.

359 I.C.C. 195 (1978).[21] This document stated that

> "[t]he Commission believes that the railroad consolidation process should not be used as a means for preserving the system of financially weak and marginal railroads or for protecting them from undergoing reorganization, if necessary, under the bankruptcy laws. The Commission is concerned with the preservation of service, not of companies or railroad systems .... If it appears that the end result of a proposed railroad consolidation would be the permanent cessation of *essential services* by some other railroad, the Commission may deny the consolidation application or condition its approval upon the willingness of the applicants to restructure the proposal." (emphasis added)

359 I.C.C. at 199–200. This is a more lenient standard of merger approval because an application will no longer be denied or conditioned merely if it harms competitors, but only if it harms them to a degree that they cannot provide "essential services." [22]

The Commission applied the new "essential services" standard throughout its BN–Frisco opinion,[23] consistently finding that the merged BN–Frisco would not eliminate any of its own essential services, 360 I.C.C. at 935, and that no competitor would be harmed to a degree that it could not provide essential service, *id.* On this appeal, the Illinois parties challenge the application of this new standard on the ground that it violates the statutory mandate. Essentially, their argument is that Congress did not intend a lenient "essential service" standard of merger approval for § 11344 proceedings, but only for the separate, expedited consolidation procedure that it created in § 11346.[24] The Illinois parties argue that the Commission has "lifted" the essential

---

**21.** The Commission denies in its brief that the "essential services" standard was a new policy. Nothing in our opinion turns on that question. We nevertheless reject that argument by the Commission because the RSPO Final Report, the Commission's own 1978 policy statement, and the BN–Frisco opinion itself all make it abundantly clear that a new policy has been developed. *See, e. g.,* BN–Frisco, 360 I.C.C. at 950–52.

**22.** The Commission specifically noted that such a policy statement

does not establish a binding norm, and it is not finally determinative of the issues or rights which it discusses. When the policy enunciated in the statement is applied in a specific proceeding, parties to that proceeding will have the opportunity to challenge or support the policy through appropriate evidence or argument.

*Railroad Consolidation Procedures,* 359 I.C.C. at 196.

**23.** *See e. g.,* the following:

(1) "The merger of Frisco into BN presents us with just such an opportunity–two railroads voluntarily initiating a transaction that will reduce their costs and improve utilization of equipment and facilities without eliminating essential services," 360 I.C.C. at 935;

(2) "Not only will the services of the merged company be significantly improved, but other railroads will be able to continue providing essential services," 360 I.C.C. at 935;

(3) "We will not protect impacted carriers simply because they find themselves in a situation where they must actively compete. As stated in our policy statement, we look only to preservation of essential rail service when imposing protective conditions, not to the protection of corporate entities," 360 I.C.C. at 944;

(4) "We do not believe that a merger should be conditioned unless essential services have been shown to be affected ...," 360 I.C.C. at 951; and

(5) "The Commission has imposed indemnity conditions when it was concerned about preserving existing service ... We no longer require that corporate entities be preserved; rather we are concerned about essential services," 360 I.C.C. at 952.

**24.** Section 11346 allows certain carriers to use its expedited procedures for merger approval before January 1, 1982. The time limit was intended to encourage speedy rationalization of the nation's rail system.

The expedited procedures allow the Commission to name a panel that must make a recommendation on the merger within 180 days. The Commission must then act on the recommendation within 120 days. The Commission approves the merger if it is "in the public interest," and does not have to consider the specific factors enumerated in § 11344(b). 49 U.S.C.A. § 11346.

services standard from § 11346 into § 11344, contrary to congressional intent.

This argument is without merit. The truth of the matter is that the "essential services" standard appears nowhere in *either* § 11344 or § 11346, or their legislative histories. It was a creation of the RSPO [25] as a new weighing of subsidiary factors *within* the public interest standard, and was properly adopted by the Commission on its own merits. Congress intended mergers initiated under either section to be evaluated by the "public interest" standard specifically stated in both.[26] The Commission has determined that the public interest standard is the same in both sections, Railroad Consolidation Procedures, 359 I.C.C. at 199, and that the preservation of essential services is one component of the same public interest standard, *id.* Section 11346 is more "lenient" only in that it expedites the merger approval procedurally and relieves the Commission of the duty to consider the four factors required in § 11344(b).[27] We reject the contention of the Illinois parties. The Commission is free to apply an essential service standard as a component of the "public interest" under either § 11344 or § 11346.

The Illinois parties next argue that the essential service standard violates the Commission's obligation to consider "the effect of the proposed transaction on the adequacy of transportation to the public." 49 U.S.C. § 11344(b)(1). Soo repeats that objection and also contends that the new standard (1) violates the national transportation policy and the Commission's responsibility to pro-

tect the total public interest under § 11344; and (2) violates 49 U.S.C. § 10101, which establishes the national transportation policy of ensuring "the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States." Neither the Illinois parties nor Soo offer any more specific or substantial arguments on behalf of these contentions. Instead, Soo debates procedural objections that we discuss below, and the Illinois parties argue only that the new standard "unleashes ruinous market forces," pointing to the loss of one train daily between Centralia and Galesburg, Illinois.

Without more assistance from the parties, we can find no inconsistency between the essential services standard and the "adequate transportation" consideration mandated by § 11344(b)(1), or any other statutory requirement cited by Soo. As stated above, the decision to approve a merger or impose protective conditions always involves a balance of improved service and carrier strength in the merging railroads against possible decreased service and carrier strength in competitor railroads. In the past, the Commission would deny a merger or dissipate its benefits in the form of protective conditions merely if a competitor were harmed or lost a share of the market.[28] The essential services standard represents a new weighing of those same factors: a merger that is otherwise beneficial to the public will not be denied or conditioned unless essential services to the public are lost. Railroad Consolidation Proce-

---

**25.** The RSPO apparently *believed* that "the preservation of essential service" was "emphasized" in § 11346, in contrast to the Commission's policy of ensuring the survival of marginal carriers by forcing their inclusion in mergers proposed by stronger lines. RSPO Final Report at 38. But the RSPO cited no authority for finding this "emphasis" in § 11346, and none has been cited to us by any party on appeal. It matters not, however, because the Commission adopted and adequately explained its essential services standard without any mention of Congressional authorization from § 11346. Railroad Consolidation Procedures, 360 I.C.C. at 195–200. Because this policy was adopted with the proper explanation and is clearly with-

in other statutory guidelines, it stands on its own feet, regardless of what the RSPO thought § 11346 "emphasized."

**26.** The Illinois parties attempt to find some basis for distinction between §§ 11344 and 11346 in the fact that the former says "consistent with the public interest" while the latter says "in the public interest." There is no legislative history or other statutory basis whatsoever to support this strained argument.

**27.** Section 11346 is summarized in note 24.

**28.** *See, e. g.*, the Commission opinions cited in notes 13–16.

dures, 359 I.C.C. at 198–200. The Commission has determined that the public will benefit in overall service if competing carriers are less shielded from the need to face the challenge of strong merged carriers. Burlington Northern, Inc.–Control and Merger, 360 I.C.C. at 950–52. In order to gain that overall benefit for the public, the Commission has decided that only "essential services" should be protected. We find that new weighing of the public interest perfectly appropriate under § 11344(b)(1) and any of the other broad statutory standards. Furthermore, it is exactly the kind of sensitive re–evaluation of "the public interest" that Congress intended the Commission to undertake. *American Trucking Associations, Inc. v. Atchison, Topeka, and Santa Fe Railway*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967).

Soo finally objects to the essential services standard because it is a departure from the Commission's longstanding policy to impose protective conditions merely to preserve the competitive ability of non–merging carriers. But it is established beyond argument that an agency may change its policies so long as it identifies and articulates its reasons for doing so. As the Supreme Court has stated in another ICC case:

[W]e agree that the Commission, faced with new developments in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice. [citations omitted.] In fact, ... this kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.

*American Trucking Associations*, 387 U.S. at 416, 87 S.Ct. at 1618.

The Commission must explain its departure from previous policy so that a reviewing court may determine that the decision is reasoned and not arbitrary. *Burlington Truck Lines v. United States*, 371 U.S. 156, 167–68, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). But the Commission abundantly fulfilled that task in its 1978 policy statement and in the BN–Frisco opinion itself.[29]

---

**29.** The relevant discussion from the 1978 policy statement, Railroad Consolidation Procedures, 359 I.C.C. at 199–200, was quoted in the fourth paragraph under VI.1.

In the BN–Frisco opinion, the Commission reviewed its more liberal use of protective conditions in prior mergers, then said

This has been our policy in the past. However, the overriding factor governing the imposition of all conditions in the past has been the public interest. We would be remiss if we did not consider today's limits when imposing conditions on a railroad merger instead of viewing the industry as static. ... The voluntary consolidation of more than one railroad, when properly conceived and executed, is expected to yield certain benefits to that railroad. Any condition imposed on that merger tends to decrease or eliminate the merger's expected benefits ....

As we have said, railroads do not have a proprietary right in the future to the traffic they have carried in the past. Therefore, we need not protect railroads from the possible loss of traffic through diversion to a merged

railroad. On the contrary, protecting competitive railroads tends to limit a shipper's ability to obtain the best service from the merged company and dampens the incentives for competitive response to the merged company from existing railroads....

We have stated that we would not impose conditions solely to compensate carriers for diversion or protect them from the risks of competition. In connection with transactions such as this, it is not practicable, nor would it be in the public interest, to impose conditions calculated to freeze the flow of traffic into a preexisting pattern or to protect competing and connecting carriers against all possible adverse effects which might follow from the unification and resulting improvements in service by the surviving corporation. Such action would prevent, to a substantial extent, the effectuation of service improvements to which the shipping public is entitled, and would unduly restrict the unified company in its solicitation and routing of traffic under development of a strong competitive system.

Having concluded that the "essential services" standard is clearly within statutory guidelines and has been adequately explained, our review of that issue is complete.

2. *The Limitation of D.T. & I. Conditions*

 In virtually every merger approval since 1950, the Commission has imposed D.T. & I. conditions permanently, while retaining jurisdiction to amend or remove the conditions at any time. Thus all of the parties to this proceeding assumed the existence of "permanent" D.T. & I. conditions in preparing economic data and traffic diversion projections for the Commission's use. After the record was closed, however, the Commission informed the parties in its order setting the case for oral argument that it might approve the merger without permanent D.T. & I. conditions. No parties objected during the course of oral argument before the Commission that this decision might undermine other evidence.[30] Prior to the release of the BN–Frisco opinion, the Commission announced in Seaboard Coast Line Railroad, et al.–Investigation of Control and Modification of Traffic Conditions, 360 I.C.C. 582, 603 (1979), *appeal pending* on other grounds, 5th Cir. No. 80–5030, that it was adopting the "essential services" standard in relation to D.T. & I. conditions and

would entertain petitions for the removal or modification of conditions imposed in prior mergers. The Commission also announced in *Seaboard* that it now interprets the Interstate Commerce Act to provide most of the same protection against unfair carrier practices previously offered by D.T. & I. conditions.[31]

In the BN–Frisco opinion, the Commission took the unusual action of imposing D.T. & I. conditions and retaining jurisdiction for a two year period only. Katy, Soo, and the Kansas City Board of Trade object on appeal that this two–year limitation nullified the Commission's substantial evidence as to the effects of the merger after the second year, because all of the data before the Commission assumed that D.T. & I. conditions would be imposed indefinitely.

For the purpose of discussion, it will be helpful to distinguish two kinds of traffic diversions involved in this question. The first is the kind of diversion that is inherent in the merger with or without D.T. & I. conditions, merely because the single–line BN–Frisco service will be faster or more efficient than parallel service over Katy or Soo that must interconnect with BN–Frisco or some other carrier. All the parties agreed that these diversions, which we will

> We do not believe that a merger should be conditioned unless essential services have been shown to be affected . . . .
> 360 I.C.C. at 950–51.

**30.** In fact, no party even mentioned that a decision not to impose permanent D.T. & I. conditions would affect other evidence. In the course of oral argument by the BN counsel on another issue, Commissioner Alexis interjected the question whether BN was saying that it had no evidence as to the diversions that would occur in the absence of D.T. & I. conditions. Counsel answered in the affirmative, but the issue was never developed or even mentioned again in the entire record.

**31.** See note 12 and the accompanying text for examples of the unfair practices prohibited by D.T. & I. conditions.

The Commission's new interpretation of the Act was stated as follows:

> We acknowledge that the railroads are a highly interdependent network and that open routings, gateways, and interchanges are essential. In the past we have used the DT & I

> conditions to prevent the closing of routes and gateways and to prohibit discrimination at interchanges. We now believe that this practice is overly broad, in view of the changes in the industry's structure over the last 15 years. The Interstate Commerce Act provides the needed protections of particular interchanges and services, and in the future, we will enforce the statutory provisions to assure open routing, gateways and interchanges. See 29 U.S.C. 11101 (formerly section 1(4)), imposing the common carrier obligation to provide service and to establish reasonable through routes and rates; 49 U.S.C. 10741 (formerly section 3(4)), requiring equal interchange facilities; and 49 U.S.C. 10705 (formerly sections 15(3) and (4)) authorizing the Commission to establish through rates, joint rates and the division of joint rates. Evidence relating to the need for protection against predatory or unfair competitive practices can be submitted with a complaint filed under these provisions.
> *Seaboard,* 360 I.C.C. at 603.

call "inherent" diversions, would be effected only over a three–year period, presumably because of the time necessary to integrate the two lines and make shippers aware of the benefits. The second type of diversion would be possible only when D.T. & I. conditions are lifted, so that the BN–Frisco could, subject to several contingencies discussed below, close routes or rates it previously maintained with Katy or Soo, for example, and take that traffic entirely for itself. We will call this second type "post–D.T. & I." diversions.

The Commission made a specific finding, based on the projections of all parties, that 95% of the "inherent" diversions would be achieved by the end of the second year, 360 I.C.C. at 1108, when D.T. & I. conditions would still be in place. It is therefore fair to say that the Commission had substantial and reliable evidence as to 95% of the diversions that will occur because of the benefits that are inherent in the merger itself. If any post–D.T. & I. diversions occur–and that is very much open to question, as we discuss below–they will involve a simple transfer of traffic and revenues from the weaker competitor to the stronger BN–Frisco. Thus the benefits of the merger to BN–Frisco and to the public it serves could

only be *increased* by post–D.T. & I. diversions. The negative effects of these diversions would be solely a question of lost traffic and revenues to the weak carriers, which can be remedied entirely by adjustments to the protective conditions themselves, rather than by re–assessing the entire merger. Consequently, the Commission's substantial evidence supporting the approval of the merger itself is unaffected by the decision to limit D.T. & I. conditions.[32]

If the limitation of D.T. & I. conditions nullified substantial evidence used by the Commission, the only decision affected would be the conclusion that the competing carriers had no need of special protective conditions or of the standard D.T. & I. conditions after the second year.[33] Of course, the Commission's evaluation of competing carriers is supported by substantial and reliable evidence through the second year, when D.T. & I. conditions will still be in effect. But the picture *may* change greatly in the third year. That is a problem only because the Commission's opinion frequently cites figures and projections for the third year that are completely unreliable if substantial post–D.T. & I. diversions occur in that year.[34]

---

**32.** Katy and Soo have argued that any current doubt about the Commission's decision regarding the need for protective conditions also calls into question the Commission's approval of the entire merger, because the Commission might decide that the merger is not in the public interest *with* the particular protective conditions it might find necessary to protect competing carriers. We disagree. The Commission obviously viewed the approval of the merger as a decision quite distinct from any future changes it might make in protective conditions: it specifically retained jurisdiction *only* over protective conditions and released the merger approval from its control. The merged company will thus become one of the "given" factors in any future re–evaluation of a competitor's need for protection in the context of the larger public interest.

This argument also overestimates the matter that might be in doubt. Inherent diversions are unaffected by the D.T. & I. limitation. Post–D.T. & I. diversions, if they occur, can be corrected without the slightest reduction in the benefits that the Commission found to justify the merger. For instance, if the Commission found that $10 million in post–D.T. & I. diver-

sions will occur from Katy to the merged BN–Frisco each year, even a complete indemnification of Katy for the full $10 million of added diversions, the most far–reaching protective condition that the Commission could impose, would leave all of the other merger benefits relied upon by the ICC completely intact. The $10 million that the BN–Frisco would be required to return to Katy would leave intact the $33 million in new revenues that the BN–Frisco had gained from inherent diversions and other merger benefits.

**33.** As this sentence makes clear, part of the difficulty in discussing the Commission's D.T. & I. limitation is the circularity of the issue itself: did the Commission's decision not to impose protective conditions undermine the substantial evidence it needed to decide whether to impose protective conditions?

**34.** It is totally within the Commission's expert judgment to choose the period of time that is relevant to evaluate a merger's future effect on the public interest. The Commission's rules for evidence and exhibits submitted in merger pro-

Whether these diversions do occur, however, is a matter that is *entirely* subject to future decisions of the Commission and the parties to this action. First of all, the Commission specifically retained jurisdiction over the conditions for two years. 360 I.C.C. at 1179–80. As all of the parties gain experience with the actual impact of the merger, any of them can submit a proposal to the Commission to extend the D.T. & I. conditions into a third year or longer, if the actual facts justify such protection.[35] Second, the Commission's new view that the Interstate Commerce Act prohibits most of the unfair practices previously controlled through D.T. & I. conditions[36] means that any carrier may, in effect, extend the D.T. & I. conditions by protesting any discriminatory practices to the Commission. Third, as the Commission noted, 360 I.C.C. at 957, during the first two post–merger years the affected carriers will be able to make significant adjustments to the new competition. Katy and Soo have a strong incentive to meet the challenge of the more efficient BN–Frisco, and their response may greatly reduce or eliminate the post–D.T. & I. diversions that might occur if the two contingencies discussed above do not prevent those diversions in the first place.

▮ Furthermore, the Commission's projection of carrier economic conditions three years into the future is a kind of agency function that the Supreme Court has recognized to be primarily a question of probabilities, and thus peculiarly subject to the expert experience, discretion, and judgment of the Commission. In making a predictive judgment, the expertise of the Commission supplements, and may supplant, the projections placed in the record by the parties. *FCC v. National Citizens Commission for Broadcasting,* 436 U.S. 775, 814, 98 S.Ct. 2096, 2122, 56 L.Ed.2d 697 (1978); *United States v. ICC,* 396 U.S. 491, 516, 90 S.Ct. 708, 720, 24 L.Ed.2d 700 (1970); *FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 28–29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961); *United States v. Detroit & Cleveland Navigation Co.,* 326 U.S. 236, 240–41, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945). To hold otherwise would paralyze agencies merely because the future is not subject to proof. While an agency cannot make a projection that is without any reasonable basis, the role of substantial evidence is greatly diminished. The unique context of this decision, particularly the fact that the Commission remains completely in control of whether any post–D.T. & I. diversions actually occur, gives the Commission a reasonable basis to project Katy's and Soo's economic future and need for protective

---

ceedings require that all projections cover the first three post-merger years. 49 C.F.R. §§ 1111.1–.2. The BN–Frisco opinion also cites and relies upon many projections that extend into the third year. Of course, these indications that the Commission looked at third year figures that were based on certain assumptions did not automatically prohibit the Commission from altering any of those assumed conditions. That would be far too rigid a straightjacket to impose on administrative procedures. Likewise the Commission could change the relevant focus to a two–year period and explain its choice. That is essentially what the Commission did here–the issue is complicated only because the Commission did not fully and directly explain the change in focus.

**35.** In prior merger approvals, the Commission had always retained jurisdiction over D.T. & I. conditions indefinitely, so that any party could petition to amend or remove the conditions. In light of this practice, the Commission's limitation of D.T. & I. conditions to two years, with the retention of jurisdiction, really amounts to little more than a procedural decision to reverse the burden of proof. Prior decisions had assumed D.T. & I. conditions remained justified unless a protesting party objected and proved otherwise. The Commission now assumes that, after two years, they will not be justified unless a protesting party objects and proves otherwise.

**36.** See note 31 and accompanying text.
An example of the Act's duplication of D.T. & I. conditions is that 49 U.S.C. § 10705(d) currently gives Katy the power to challenge any future cancellation by BN–Frisco of a through route or joint rate and to force BN–Frisco to prove before the Commission that such cancellation is consistent with the public interest. That one section alone gives Katy substantial safeguards against post–D.T. & I. diversions.

conditions throughout the three–year period under examination.[37]

Because the evidence before the Commission was 95% complete and reliable, through the second post–merger year, and especially because the third–year impact is entirely subject to the future actions of the parties and the continuing jurisdiction of the Commission, we do not find that the two–year limitation undermined the Commission's ability to project the need of competing carriers for protective conditions.[38]

### 3. The Denial of Special Protective Conditions

■ Both Katy and Soo asked the Commission to impose extensive special protective conditions, in addition to the standard D.T. & I. conditions, to protect them from various detrimental effects of the merger. Katy requested, among other conditions, complete indemnification for 20 years against all traffic lost to the merged BN–Frisco, regardless of the reason for the diversion and regardless of Katy's other income. Soo requested a variety of conditions[39] that not only would insulate it from economic loss, but would actually improve its long–term financial position by more than $8 million.

The Commission denied these requests for special protective conditions and indemnifi-cation. Katy argues on appeal that the decision of the Commission to deny indemnification and special protective conditions was based upon projections of Katy's ability to survive the losses, both of which were not supported by adequate findings or substantial evidence. Specifically, Katy says that (1) the Commission made no specific findings as to the net revenue effect from the three sources of Katy's new positive financial standing as identified by the Commission and (2) it was improper for the Commission to consider these three sources of financial stability because they are "speculative".

■ Katy's first point of error is without merit because, as discussed under VI.2. above, an agency is not required to make specific findings in the course of making future projections. *National Citizens Commission*, 436 U.S. at 814, 98 S.Ct. at 2122; *United States v. ICC*, 396 U.S. at 516, 90 S.Ct. at 720; *Transcontinental Gas Pipe*, 365 U.S. at 28–29, 66 S.Ct. at 77. This reasoning even allows an agency to speculate about the future to some degree, based on available facts. *McLean Trucking*, 321 U.S. at 89, 64 S.Ct. at 381. Thus Katy's second point of error is also without merit, even if we accepted Katy's characterization of the Commission's projection as "speculative."

---

**37.** We are especially inclined to allow the Commission leeway in these future projections because it is clearly developing an entirely new set of policies regarding D.T. & I. conditions. In fact, the Commission has announced a rule-making proceeding that might eliminate all past D.T. & I. conditions and establish a rule for their future use. 45 F.R. 46461 (July 10, 1980). The BN–Frisco opinion acknowledged the probability of such a proceeding and that the two year limit on D.T. & I. conditions is part of the Commission's re–evaluation process. 360 I.C.C. at 957.

**38.** We acknowledge that the Commission's explanation of its decision leaves much to be desired. When the Commission's own rules and the bulk of its opinion had indicated that the third year was of some significance, the Commission should have explained the two year limitation more thoroughly. The only specific explanation offered was:

> We believe this will give affected carriers significant time to adjust to the new competitive climate. Although we understand that the routing practices between the railroads are of longstanding [sic], that does not require that it take a long time to change them. We are currently reevaluating our imposition of traffic protective conditions and will issue a policy statement on the matter shortly which may modify these conditions, but only after careful consideration.

360 I.C.C. at 957.

We do not mean to condone or encourage such abbreviated explanations of agency action. Nevertheless, we may uphold "a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). With the aid of our strongest bifocals, we can trace the Commission's footsteps here, in the light of the opinion as a whole.

**39.** See note 10 above.

But a review of the record shows that the Commission cited very reliable evidence as the basis of its projection that Katy can withstand these diversions without a loss of essential service. The Commission fully acknowledged Katy's bleak financial history, but the relevant decision was concerned with Katy's *future*, and in that context the Commission gave greater weight to three new sources of financial stability for Katy. 360 I.C.C. at 954–55, 1118–22. First, the Commission found that Katy can expect strong growth in revenues because of coal transportation for several new electric generating plants. Three of the units were completed as of the time of the Commission's opinion, and Katy itself projected $26 million annually in new revenues from these plants alone. Five additional units were and are projected, each generating $10 million in additional gross revenues for Katy. These findings alone would support the Commission's view that Katy can withstand the merger, because the maximum gross revenue loss for Katy due to the merger is projected to be about $9 million. 360 I.C.C. at 1091. Second, the Commission found that Katy will experience substantially reduced maintenance costs because of the imminent completion of a major track rehabilitation program. Again, the testimony of Katy's own witnesses largely supported the Commission's evaluation of the program. Katy cannot argue with the Commission's choice to believe them. Third, the Commission recognized that Katy had concluded an agreement with its parent company to be reimbursed for any Katy tax losses that could be utilized by the parent company. The agreement is an undisputed fact, and demonstrably provides Katy with a significant "cushion" against losses. It was not an improper consideration in evaluating Katy's overall financial stability. Taken together, these three factors offer substantial support for the Commission's projection of Katy's future.[40] If the first

two post–merger years prove the Commission to have been wrong, Katy has a complete remedy in petitioning the Commission to amend the conditions imposed on the merger.

Soo argues on appeal that the Commission's projections of its losses due to the merger were not supported by substantial evidence and that, therefore, the decision to deny Soo's requested protective conditions must be remanded. We reject this argument because the Commission made a specific finding that Soo could easily withstand even the larger diversions and losses that Soo itself projected. 360 I.C.C. at 953. Soo does not challenge that finding, so the exact amount of Soo's projected losses is immaterial for the purposes of this review. The Commission's ultimate conclusion, that Soo did not need protection, is not affected even if Soo's projections are more accurate that the Commission's.

### 4. The Commission's New Policies Regarding Indemnification

■ The Commission also announced in its decision two new policies: (1) indemnification of a competitor railroad for traffic losses due to a merger will no longer be viewed as a viable protective condition "under any circumstances," and (2) the Commission will no longer impose any protective condition not sought by a protesting railroad. 360 I.C.C. at 953. In sections VI.2. and 3. above, we rejected Katy's argument that there was no substantial evidence to support the finding that Katy did not need special protective conditions, including indemnification. Katy now asserts as an independent ground of error that these two new policies as applied to Katy were arbitrary, capricious, and a violation of procedural due process because they were adopted "without warning."

■ It is true that the Commission's new policies regarding indemnification and "unrequested conditions" were not an-

---

**40.** We note that Katy reported most of these same projections in glowing terms to its own shareholders in the company's 1977 annual report, which was part of the record before the Commission. Furthermore, Katy's briefs and oral argument on this point were little more than requests that we re–weigh the evidence, a task that has long been recognized to be beyond the competence of a reviewing court.

nounced until the BN–Frisco opinion. But even if both of these policies were applied to Katy in this opinion, a matter itself very much in question,[41] that would not provide the slightest ground of error. An agency may change its policies in the course of a specific adjudication, *American Trucking*, 387 U.S. at 416, 87 S.Ct. at 1618, and even apply those policies for the first time to the parties involved, *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292–94, 94 S.Ct. 1757, 1770–71, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 202–04, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947). The only restriction upon an agency's discretion to develop policy in this manner is that the agency must adequately explain its departure from the previous policy. *Atchison, T. & S. F. Ry.*, 412 U.S. at 807–08, 93 S.Ct. at 2374–75 (1973).

The Commission's duty to explain its change in policy regarding indemnification was adequately fulfilled in the BN–Frisco opinion itself.[42] We find that explanation entirely satisfactory, which completes our inquiry regarding the new indemnification policy.

The Commission's explanation of its "unrequested conditions" policy is given in the context of a discussion of the Commission's new restricted use of protective conditions. The "policy" is announced less as an independent principle than as a means of ensuring that conditions are not imposed unless substantially justified:

> We do not believe that a merger should be conditioned unless essential services have been shown to be affected . . . .
> Hence, a condition would not be imposed

which drains the benefits of a proposed merger unless it benefits shippers, is operationally feasible, is related to the competition that will ensure [sic] from the merger, *is sought by the protestant . . .*, and would not jeopardize the future of the merged company by depriving it of major benefits of the merger. (emphasis added)

360 I.C.C. at 951–52. A more thorough analysis would be helpful. But in the context of the Commission's larger policy decision restricting the use of protective conditions, the "unrequested conditions" policy is adequately explained as a means of implementing the larger policy. The Commission is merely announcing that it will no longer take the initiative in suggesting protective conditions. It is reasonable to assume that a carrier will request those conditions that are actually needed in a merger, and that the Commission's former policy of initiating protection often led to unnecessary restrictions. The explanation might have been more complete, but we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). That standard has been met here, once the "policy" is viewed in its proper context.

Katy further argues that, even if these two new policies are otherwise proper, their joint application for the first time to Katy is a denial of due process because Katy relied on receiving indemnification, so requested no other special protective conditions and is now foreclosed from requesting

---

41. See the final paragraph of this section.

42. The explanation was given as follows:
 The Commission has imposed indemnity conditions when it was concerned about preserving existing service for the public and when it appeared that alternate protective conditions would not accomplish this result.
 Our imposition of indemnification in the past has been to allow a carrier to continue to provide service while a more permanent solution was being finalized. We no longer require that corporate entities be preserved; rather, we are concerned about essential services. In this climate a provision of in-

demnity seems highly anticompetitive. Indemnity may well induce a carrier to become less aggressive and provide less than optimum service. Indemnity also may be viewed as a reward for being unable to compete in the marketplace. This transfer of funds would, in effect, be a massive cross–subsidization not only of commodities, but of inefficient operation of another railroad, merely to preserve the existence of the other railroad. Hence, we do not see indemnity as a viable condition under any circumstances.
360 I.C.C. at 952–53.

any additional protection. This argument is undercut from all sides. In the first place, there is no indication in the opinion itself that the Commission reached any decision through applying the new policies to Katy. The Commission consistently states that Katy failed to establish the need for any protective condition at all, a decision on the merits that does not involve either policy. Second, if Katy relied upon receiving indemnification, that reliance was grossly misplaced. The Commission has imposed indemnification only twice in its history. Penn Central Merger Case, 322 I.C.C. at 529, 532 (1966); Chicago & Northwestern Railway–Control–Chicago Rock Island and Pacific Railroad, 347 I.C.C. 556, 616, 627, 630, 631 (1974). And even if it were not misplaced, such reliance cannot stand in the way of an agency's new policy determinations, at least absent "substantial" adverse consequences. Bell Aerospace, 416 U.S. at 295, 94 S.Ct. at 1772. Assuming arguendo that the Commission applied the policies to Katy, we cannot say that Katy has suffered "substantial" adverse consequences when it can petition the Commission to amend the conditions should the future show that the Commission's judgment was wrong. We therefore find no basis to remand the Commission's decision on these grounds.

### 5. The Anticompetitive Effects of the Merger

■ The Commission found that the merger "will not adversely diminish competition" and would, in fact, stimulate overall competition. Although the Commission used the Department of Justice study that came to the same basic conclusion, the opinion indicates that the Commission also relied upon its own studies, data, and conclusions. 360 I.C.C. at 941. The Illinois parties charge that this analysis was defective, but the only substantial grounds they ad-

vance are that the Commission did not make specific findings about the tendency of the BN–Frisco merger to encourage other mergers in the future. This argument is, once again, based on a misunderstanding of the need for specific findings in the context of an agency's projections of the future. National Citizens Commission, 436 U.S. at 814, 98 S.Ct. at 2122; United States v. I. C. C., 396 U.S. at 516, 90 S.Ct. at 720; Transcontinental Gas Pipe, 365 U.S. at 28–29, 66 S.Ct. at 77. In addition, the Commission noted that

> [a] domino type effect from a merger of this sort is not necessarily contrary to the public interest. Indeed, where rail carriers are forced to look to rationalization, operating efficiencies, elimination of redundant facilities, and improved service through some form of consolidation or restructuring to continue essential services, the public interest can only benefit.

360 I.C.C. at 930. Any future mergers will be evaluated on their own merits to determine whether they are consistent with the public interest. Consequently, no other findings about future mergers were necessary in the BN–Frisco opinion.

### 6. Employee Protection

■ The operating efficiencies created by railroad mergers often result in a loss of positions for current employees. Section 11347 of the Interstate Commerce Act[43] therefore requires the Commission "to provide a fair arrangement . . . protective of the interest of employees who are affected by the transaction . . . ." The second sentence of this provision allows "the rail carrier and the authorized representative of its employees" to negotiate their own protective arrangement, obviating the need for the Commission to impose employee protection.

---

**43.** The current text of § 11347 reads, in relevant part, as follows:

When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the in-

terest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 565 of title 45. Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees.

The final issue in this appeal is whether that requirement is intended to cover employees of any carrier, or only employees of the merging railroads. The RLEA has urged the broader interpretation upon the Commission and reviewing courts since 1946, largely without success. The Commission has consistently held that § 11347 covers only employees of merging carriers,[44] and has been upheld twice by reviewing courts.[45] The RLEA position has been clearly affirmed by a reviewing court only once.[46]

In the BN–Frisco opinion, the Commission considered the effect of the merger on all carrier employees as part of its broad view of the public interest under § 11344(c). But only the employees of BN and Frisco were granted actual protection in the Commission's order. 360 I.C.C. at 946–48. The Commission thoroughly discussed the RLEA position, but rejected it based on a view of the statute as a whole, its legislative history, and its interpretative history.

The Commission first noted that, although the first sentence of § 11347 seems to require protection for *any* carrier employee affected by the merger, the second

sentence provides, in an undifferentiated transition, that "the arrangement may be made by the rail carrier and the authorized representative of its employees." It is difficult to imagine that when Congress wrote this sentence it was contemplating that a non–merging carrier would agree to protect its own employees from the merger of two competing carriers. Because the second sentence obviously applies only to the merging carrier, the Commission reasons that Congress intended that same meaning in the preceding sentence.

The Commission finds this interpretation fortified by the statute's legislative history. Section 11347 is descended directly from the Washington Job Protection Agreement of 1936 (WJPA), which served as the model for § 5(2)(f), later recodified as § 11347, when it was first enacted as part of the Transportation Act of 1940. *Brotherhood of Maintenance of Way Employees v. United States*, 366 U.S. 169, 173–74, 81 S.Ct. 913, 915, 6 L.Ed.2d 206 (1961); *United States v. Lowden*, 308 U.S. 225, 237–38, 60 S.Ct. 248, 254–55, 84 L.Ed. 208 (1939).[47] The WJPA limited its job protection to employees of the merging carriers.[48] The Commission

---

**44.** New York Dock Ry.–Control–Brooklyn Eastern Dist., 354 I.C.C. 399 (1978), 360 I.C.C. 60 (1979); Great Northern Pac.–Merger–Great Northern, 331 I.C.C. 228 (1967); Pennsylvania R.R.–Merger–New York Central R.R., 328 I.C.C. 304, 343–344 (1968); Texas & Pacific Ry.-Control–Kansas O. & G. Ry., 321 I.C.C. 309, 339 (1964); Seaboard Air Line R.R.–Merger–Atlantic Coast Line, 320 I.C.C. 122, 203–204 (1963), *aff'd Florida East Coast Ry. v. United States*, 259 F.Supp. 993, 1019 (M.D.Fla.1966), *dismissed as moot sub nom. R. L. E. A. v. United States*, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967); Chesapeake & O. Ry.–Control–Baltimore & O. R.R., 317 I.C.C. 261 (1962); Southern Ry.–Control–Central of Georgia Ry., 317 I.C.C. 557, 567–8 (1962), *aff'd, R. L. E. A. v. United States*, 226 F.Supp. 521 (E.D.Va.1964); Baltimore & Ohio R.R. Operation, 261 I.C.C. 615, 619–20 (1946).

**45.** *Florida East Coast Ry. v. United States*, 259 F.Supp. 993, 1019 (M.D.Fla.1966) (*affirming Seaboard Air Line Railroad*), *dismissed as moot sub nom. R. L. E. A. v. United States*, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967); *R. L. E. A. v. United States*, 226 F.Supp. 521, 525 (E.D.Va.1964).

**46.** *Soo Line R.R. v United States*, 280 F.Supp. 907 (D.Minn.1968). The RLEA also cites *R. L. E. A. v. United States*, 216 F.Supp. 101 (E.D.Va. 1963), as authority for its position. We interpret that case to be based on the unique factual situation that the employees of the nonmerging railroad found to be covered under § 11347 were in effect employees of the merging railroad. A later decision by the same court refused to follow the broader interpretation of *Soo Line* urged upon us by the RLEA and upheld the ICC position. *R. L. E. A. v. United States*, 226 F.Supp. 521, 525 (E.D.Va.1964).

**47.** *See, also, New York Dock Ry. v. United States*, 609 F.2d 83, 86 (2d Cir. 1979); testimony of George M. Harrison before the House Committee on Interstate and Foreign Commerce, H.R. 2531, 76th Congress, 1st Sess. 213, 216–17, 241, 243 (1939), and before the Senate Committee on Interstate Commerce, S. 1310, 2016, 1869, and 2009, 76th Cong., 1st Sess. 34 (1939).

**48.** For example, § 4 of the WJPA, quoted by the Commission, 360 I.C.C. at 949, n.81, reads: "Each carrier contemplating a coordination shall give at least ninety (90) days written no-

reasoned that this legislative history indicates Congress did not intend § 11347 to require a more liberal scope of job protection.

Finally, the Supreme Court has stated that a reviewing court may "accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re–enacted the statute without pertinent change." *Bell Aerospace*, 416 U.S. at 275, 94 S.Ct. at 1762. Congress re–enacted and amended § 5(2)(f) in the 1976 4R Act, adding a requirement that an employee protection agreement under that section "shall contain provisions no less protective of the interests of employees than those heretofore imposed pursuant to this subdivision . . . ." 49 U.S.C. § 5(2)(f).[49] The Act, including § 5(2)(f), was further amended and recodified into 49 U.S.C. § 11347 in 1978. Revised Interstate Commerce Act, Pub.L. No. 95–473, 92 Stat. 1337. That act clarified the language of the 1976 amendment and again affirmed the Commission's use of employee protection prior to 1976. Because the Commission's view of its authority under § 5(2)(f) was well–established in 1976 and 1978, this double affirmation by Congress, in the absence of any other support for the RLEA position,[50] puts the question to rest. We affirm the Commission's view that § 11347 requires protection only for employees of the merging carriers.

 The RLEA asserts as an independent error that § 11344(b)(4) requires the Commission to consider the "interest of carrier employees affected by the proposed transaction" as an element of the public interest before it decides that a merger is "consistent with the public interest." Based on certain language in the opinion,[51] the RLEA claims that the Commission violated this statute by considering the interest of employees only after deciding to approve the merger.

We reject this contention. Section 11344 is not intended to dictate a procedural order for the Commission's considerations. The statute says, "[in] a proceeding under this section, the Commission shall consider at least the following . . . ." That language clearly sets forth a list of considerations, and does not dictate a procedure. The Commission has fulfilled the requirement of § 11344(b)(4) if it considers employee interests during the course of its proceeding. The Commission carefully considered the interests of all employees in this case. During the course of its investigation, the Commission sent out detailed questionnaires to the fourteen carriers whose employees might be affected by the merger. Ten of these responded that their employees would not be adversely affected. Two of the remaining four carriers are now in the course of liquidation or restructuring. Of the remaining two carriers, Katy claimed a possible impact on 37 employees and admitted that even this figure would be "mitigated by attrition." 360 I.C.C. at 872. Illinois Central Gulf Railway said that adverse impacts on employees could not be "precisely defined" because any loss of jobs could be the result of "numerous variables besides the proposed merger." *Id.* at 881. We find that this investigation and the Commission's thorough discussion of the effect of

tice to bulletin boards convenient to the interested employees of each such carrier and by sending registered mail notice to the representative of such interested employees." Other sections of the WJPA also define the operation of the agreement in terms of the employees of the applicant carriers. *See, e. g.,* §§ 6(a), 7(a), 10(a), and 11(a).

**49.** The relevant text of § 11347, the successor of § 5(2)(f), is given in full at note 43 above.

**50.** The one district court case cited by the RLEA in support of its position, *Soo Line,* 260

F.Supp. at 907, did not consider the second sentence of § 11347 and was decided before Congress amended and recodified § 5(2)(f) in 1976 and 1978.

**51.** The RLEA bases its contention on the following language, used by the Commission to introduce its discussion of employee protection after having announced its approval of the merger: "Since we have decided to approve the merger, we must consider the interest of, and provide protection for, carrier employees." 360 I.C.C. at 946.

the merger on employees[52] fulfilled all of the statutory requirements.

## VII. *Conclusion*

The merged BN–Frisco will indeed present formidable new competition to the railroads in its service areas, and will change familiar shipping practices relied upon by trade organizations and businesses throughout the United States. The Commission has determined that this competition and change will reverberate beneficially throughout the rail transportation industry, and the strength of that ultimate conclusion is demonstrated by the fact that no petitioner before us could directly challenge it. We acknowledge that the Commission often failed to explain its reasoning and choices with the degree of clarity and thoroughness that we would wish. The transportation industry and the government agencies responsible for its regulation, however, are undergoing a period of profound and far–reaching change. The resulting discomposure certainly does not excuse any agency from the obligation to explain its actions. But when lapses in clarity are due to uncertainty about the future course of policy or a desire to preserve options, it is appropriate for a reviewing court to uphold the agency's choices, provided that the agency's path can "reasonably be discerned." *Bowman Transportation*, 419 U.S. at 286, 95 S.Ct. at 442. We find that to be the case here. The stay of the order of the Interstate Commerce Commission is vacated; the decision of the Commission is AFFIRMED.

---

52. *See, e. g.*, 360 I.C.C. at 872, 881, 897.