674 F.2d 1055
 NUECES COUNTY NAVIGATION DISTRICT NO. 1, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION, et al., Respondents.
PRODUCERS GRAIN CORPORATION, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION, et al., Respondents.
NUECES COUNTY NAVIGATION DISTRICT NO. 1, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION, et al., Respondents.
PRODUCERS GRAIN CORPORATION, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION, et al., Respondents.
 Nos. 78-1348, 79-1816, 80-1842 and 80-1843.
 United States Court of Appeals,
Fifth Circuit.
 May 6, 1982.
 
 Brooks & Brooks, Frank C. Brooks, Barry J. Brooks, Dallas, Tex., for petitioners.
 Robert L. Thompson, Barry Grossman, Daniel J. Conway, Dept. of Justice, Christine N. Kohl, Evelyn G. Kitay, I. C. C., Washington, D. C., for respondents.
 
 
 1
 F. William Colburn, Houston, Tex., for Houston Port Bureau, Inc.
 
 
 2
 Michael R. O'Keefe, III, New Orleans, La., Andrew P. Goldstein, Washington, D. C., for Louis Dreyfus Corp.
 
 
 3
 Donal L. Turkal, Asst. Gen. Counsel, St. Paul, Minn., for Burlington Northern, Inc.
 
 
 4
 Hugh L. McCulley, Houston, Tex., Richard E. Weicher, Chicago, Ill., Robert H. Stahlheber, St. Louis, Mo., John P. Legendre, Dallas, Tex., for Southern Pac. Transp. Co.
 
 
 5
 Petitions for Review of Orders of the Interstate Commerce Commission.
 
 
 6
 Before CLARK, Chief Judge, RUBIN, and TATE, Circuit Judges.
 
 TATE, Circuit Judge:
 
 7
 The petitioners, who represent port and shipper interests in Corpus Christi, Texas, seek review of an adjudication of the Interstate Commerce Commission that a rail rate of a carrier was not discriminatory to Corpus Christi, and of an order of the Interstate Commerce Commission that, inter alia, adopted a new standard of "common control" to be used in carrier rate discrimination cases under 49 U.S.C. § 10741(b), and that reopened and vacated two earlier Commission decisions. We affirm the Commission's rule-making and vacation orders, but we find that review of the Commission's discriminatory-rate adjudication is now moot.
 
 
 8
 The underlying central issue concerns the substantive and procedural propriety of the Commission's actions in adopting a new standard or rule of a narrow nature. The narrow area of the rule focuses on the determination of whether a common carrier has under 49 U.S.C. § 10741(b) subjected a port to rates that are unreasonably discriminatory with regard to those to other ports, in instances where that carrier does not itself provide direct service but must do so by joint rates issued in conjunction with a connecting carrier. The new standard requires a finding that the originating carrier has actually contributed to or controlled the rate insofar as it is discriminatory. Under the prior or replaced standard, the originating and connecting carriers were conclusively presumed to have "common control" of the joint rates-that, acting in conjunction as a network, they directly and effectively controlled the rates between the preferred port and the prejudiced port. For reasons to be stated, we find the Commission's adoption of a new rule of decision to be non-arbitrary and within its administrative discretion and the statutory limits for that discretion set by Congress.
 
 
 9
 We should further note that the Staggers Rail Act of 1980, Pub.L.No.96-448, 94 Stat. 1895 (1980), was not signed by the President into law until October 14, 1980. Without intimating that our rationale would necessarily be affected otherwise, we note that the Act does not apply to our review of the present decisions of the Commission, which were docketed (and decided) prior to the effective date of the Act. Id. § 706.
 
 Introductory Summary
 
 10
 In the attached appendix, we have set forth the full citation and nomenclature of the proceedings and parties to whom we will refer herein. As shown by these proceedings, the context in which the present issues arise is as follows:
 
 
 11
 In 1977, Frisco (a rail carrier) published reduced carload rates on wheat from origins in Oklahoma and Kansas to various Texas ports (Houston, Galveston, etc.-"other Texas ports"), but not to Corpus Christi. Prior to this publication, the rates had been equal to all Texas ports; the reduced rates for the other Texas ports were about 31/2 cents per hundred pounds less than those for Corpus Christi. Various Corpus Christi port and shipping interests protested, including Nueces County (a Texas port district), Producers (a regional grain marketing cooperative with a large-volume grain elevator at Corpus Christi), and Dreyfus (a large-scale shipper of grain that used the Producers elevator at Corpus Christi). The basis of their protest was that the rates were unduly preferential of the other Texas ports, and prejudicial to the Corpus Christi port, in violation of former Section 3(1) of the Interstate Commerce Act, now (in the 1978 recodification) 49 U.S.C. § 10741(b).
 
 
 12
 Frisco had lowered the rates to the other Texas ports to meet rail and truck rate-competition. The reason it had not done so for Corpus Christi was that Frisco had no direct line into that port, and the other connecting rail carriers to that port (MoPac and Southern Pacific) had refused to concur in a lowered joint rate equivalent to that published for the other ports.
 
 
 13
 In its 1977 decision in Wheat I (see appendix for this and other citations herein) rejecting these protests, the Commission held that Frisco was not in control of and did not participate in the disparate rates for Corpus Christi, because Frisco had made a good faith offer of division of the joint rates (to divide the lower rates fairly between the connecting carriers and itself), but these carriers had rejected this offer. Due inter alia to the protestant's contention that Frisco's reduced rates to other Texas ports violated outstanding Commission orders in 1954 and 1961 decisions in Corpus Christi I, the Commission reopened Wheat I. In Wheat II (1979), it then reinstated its holding that the Frisco rates to Corpus Christi were not unreasonably discriminatory (for the same reason of Frisco's lack of control thereof), but it also ordered the Corpus Christi I cases to be reopened to determine whether those decisions were consistent with Wheat II.
 
 
 14
 In Corpus Christi I (1954 and 1961), the Commission had concluded that the joint rates of various carriers transporting grain from the Midwest were unduly prejudicial to Corpus Christi and unduly preferential of the other ports. In so finding, the Commission relied upon a presumed network "common control" of joint rates, so that-if the joint rate was discriminatory-each of the carriers joining in it was held to participate in the discriminatory rate. Accordingly, the Commission entered "alternative orders," which were still in effect at the time of Wheat I (1977) and Wheat II (1979). (By an alternative order issued to correct discriminatory rates, the offending carrier(s) are ordered to abate the discrimination by raising one rate, lowering the other, or altering both. See, e.g., Texas & Pacific Ry. Co. v. United States, 289 U.S. 627, 650, 53 S.Ct. 768, 776, 77 L.Ed. 1410 (1933).)
 
 
 15
 Pursuant to Wheat II, after service, notice was published in the Federal Register reopening the Corpus Christi I cases (1954 and 1961). Wheat II, then before this court on petition for review, was on motion remanded to the Commission for its further consideration. In the resulting Corpus Christi II, decided in 1980, the Commission expressly abandoned its former presumed "common control" of joint rates and held that, in the determination of discriminatory rate issues under § 10741(b), it would in the future utilize an analysis of actual control by the originating carrier (applying the good faith order of divisions test enunciated in the Wheat cases).[1] It therefore vacated the decisions in Corpus Christi I and reaffirmed its holdings in Wheat I and Wheat II.[2]
 
 Wheat Adjudications Moot
 
 16
 Before discussing the viable issues under review, we note of our own motion that the Wheat adjudications (that Frisco's grain rates to Corpus Christi are not shown to be unreasonably discriminatory under § 10741(b)) are moot. Following Wheat I, MoPac concurred in a reduced joint rate to Corpus Christi equivalent to the reduction published for the other Texas ports. As a result, it is not contested that Corpus Christi is no longer prejudiced by the Frisco rates initially complained of. Accordingly, the three petitions for review that raise issues directed solely to the invalidity of the Wheat determinations[3] are dismissed[4] as moot.
 
 
 17
 No suggestion of mootness is made with regard to the Corpus Christi II issues presented by the remaining petition for review. See note 3. That decision's vacation of the continuing rate-equalization orders in Corpus Christi I deprived Corpus Christi interests of a former remedy by which to attack rail rate disparities; and its adoption by way of rule-making of a new rule (actual control, rather than the formerly presumed common control of joint rates) has obvious continuing effects.
 
 The Issues
 
 18
 The remaining issues presented to us for review may be summarized as follows:
 
 
 19
 I. A substantive attack upon the Commission's replacement of the former presumed "common control" rule by the new "actual control" test as an unjustified abrogation by the Commission of its previously settled interpretation designed to advance the anti-discriminatory purposes of the Interstate Commerce Act.
 
 
 20
 II. A primarily procedural attack upon the Commission's vacation by Corpus Christi II in 1980 of its 1954 and 1961 Corpus Christi I decisions.
 
 
 21
 I. The Commission's Replacement of the Presumed "Common Control" Rule by an "Actual Control" Test
 
 
 22
 In the context of the scheme of the Interstate Commerce Act ("the Act"), where carriers are permitted to establish rates for their services, the Act provides that no common carrier may "subject a person, place, port, or type of traffic to unreasonable discrimination." 49 U.S.C. § 10741(b).[5] It is to be noted that this provision includes within its scope only whether a given carrier provides discriminatory rates to a preferred and to a prejudiced point; it has no application where the rates of a given carrier to one point are disparate with those of another carrier to an equivalent point. Texas & Pacific Ry. Co. v. United States, 289 U.S. 627, 649-50, 53 S.Ct. 768, 776, 77 L.Ed. 1410 (1933).
 
 
 23
 With regard to joint rates to a point-those combined charges for the services of both the originating and the connecting carriers (with division thereof decided between the joining carriers)-, the Supreme Court early stated that
 
 
 24
 participation in joint rates does not make connecting carriers partners. They can be held jointly and severally responsible for unjust discrimination only if each carrier has participated in some way in that which causes the unjust discrimination.... If this were not so, the legality or illegality of a carrier's practice would depend, not on its own act, but on the acts of connecting carriers.
 
 
 25
 Central Railroad Company of New Jersey v. United States, 257 U.S. 247, 259, 42 S.Ct. 80, 83, 66 L.Ed. 217 (1921). As the Court later stated, reiterating the point: "A carrier or a group of carriers must be the common source of the discrimination-must effectively participate in both rates, if an order for correction of the disparity is to run against it or them." Texas & Pacific Ry. Co., supra, 289 U.S. at 650, 53 S.Ct. at 776. (Emphasis supplied.)[6]
 
 
 26
 By way of further background, a rate-discrimination case, § 10741(b), is established by showing (1) that there is a disparity in rates, (2) that the complaining party is competitively injured, actually or potentially, (3) that the carriers are the common source of both the allegedly prejudicial and preferential treatment, and (4) that the disparity in rates is not justified by transportation conditions. The complaining party has the burden of proving the presence of the first three factors, and the carriers have the burden of justifying the disparity, if possible, in connection with the fourth factor. See, e.g., Chicago & Eastern Illinois Railroad Company v. United States, 384 F.Supp. 298 (N.D.Ill.1974), aff'd. mem. 421 U.S. 956, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975).
 
 
 27
 The issue before us involves solely the third element needed to establish a claim of discriminatory rate-that the carrier be the "common source" of both prejudicial and preferential rates. The order issued in Corpus Christi II -establishing an "actual control" test rather than a presumed "common control" of joint rates-resulted from notice served and published in the Federal Register to the effect that the Commission was "considering moving from a conclusive presumption of common control to an analysis of actual control over the joint rates."[7] The decision of the Commission in Corpus Christi II limited its consideration to this criteria,[8] and its modification of its former test to determine whether a carrier is the "common source" of the discriminatory rates is the only substantive issued posed for us by this petition for review.
 
 
 28
 A. "Presumed Common Control" and "Actual Control" Tests
 
 
 29
 In Texas & Pacific Ry. Co., supra, as previously noted, the Supreme Court had indicated that, for a carrier participating in allegedly discriminatory joint rates to meet the "common source" requirement (i.e., that the carrier be the source of both the prejudicial and the preferential rate), the carrier "must effectively participate in both rates." 289 U.S. at 650, 53 S.Ct. at 776 (emphasis supplied).
 
 
 30
 At the times that the Corpus Christi I cases were decided in 1954 and 1961, the Commission used a "network common control" theory to determine whether carriers effectively participated in a discriminatory joint rate. By this test, the Commission, in effect, conclusively presumed common control because the carriers involved acted as a network, so that each was responsible for the joint rate. In the 1954 Corpus Christi case, the carriers were found to have effective common control of the rates simply by virtue of carrier participation in joint rates. See 291 I.C.C. at 469-470. In the 1961 Corpus Christi case, the carriers attempted to argue that "no one carrier effectively controls the rates to Corpus Christi and the other allegedly preferred ports." 315 I.C.C. at 162. Without any discussion of the matter, but citing Texas Pacific Ry., supra, the Commission asserted that the carriers "acting in conjunction with the originating lines, directly and effectively control the rates." Id.
 
 
 31
 During the 1970's the Commission began to modify its approach to this analysis of common control. For example, in Soybeans, Midwest to Chicago and Gulf Ports, Export, 335 I.C.C. 883, 890 (1970), vacated as moot, 416 U.S. 953, 94 S.Ct. 1964, 40 L.Ed.2d 303 (1974), the Commission refused to find common control by an origin carrier where connecting carriers refused to concur in rate changes, and where there was no showing of mutual and joint participation in the action alleged to be discriminatory. In Corn and Soybeans Midwest to Gulf Ports, For Export, 349 I.C.C. 1, 4 (1974), the Commission held that where a carrier served one port directly and one by means of a joint service with a second railroad, section 10741(b) "does not give this Commission the power to require equalized rates in the event that the second railroad refuses to participate in an equalized joint rates."
 
 
 32
 The Commission's movement away from applying a conclusive presumption of common control of joint rates culminated in Wheat I and, particularly, in Wheat II. In the latter decision, the Commission explicitly adopted an "actual control" test, see note 1, and explicitly rejected the common-control presumption: "To summarize, because of the need to assure rate flexibility, we have required proof that the railroads actually control the rates to the preferred and prejudiced ports. In this regard, we believe that the presumption of control extending from the existence of a network such as was found to exist in the Corpus Christi cases is insufficient to assure that actual control exists. While seeking proof of actual control, we have allowed the railroad to show that it does not have such control because it could not, after acting in good faith, arrive at divisions agreements." Wheat II, 359 I.C.C. at 604. As a consequence, after service and publication of notice, reopening Corpus Christi I to consider a substitution of an actual control test for the former presumption of network control, see note 7, the Commission by way of a rule-making procedure adopted in Corpus Christi II the order presently under review: "The actual control standard shall be used to determine the common source of unreasonable discrimination under 49 U.S.C. 10741(b) in future challenges to carrier rate adjustments to the ports in these proceedings." 364 I.C.C. at 279.
 
 B. The Scope of Our Review
 
 33
 The scope of our review of Interstate Commerce Commission action is reiterated in Missouri-Kansas-Texas Railroad Company v. United States, 632 F.2d 392 (5th Cir. 1980), cert. denied, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981), which involved, in part, the Commission's adoption of a different standard for determining whether a railway merger is "consistent with public interest." We stated: "We can ask only whether the Commission has observed the statutory limits that Congress has set for its discretion, whether its action was arbitrary or capricious, or whether its findings are supported by adequate analysis and substantial evidence in the record as a whole." Id. at 400.
 
 
 34
 The "arbitrary and capricious" standard is narrow and permits a reviewing court merely to consider whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971). The "substantial evidence" standard requires a determination that agency findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). If the evidence of record is such that it supports inconsistent inferences and conclusions, the courts must defer to administrative choice. Illinois Central Railroad Co. v. Norfolk & Western Railway Co., 385 U.S. 57, 69, 87 S.Ct. 255, 262, 17 L.Ed.2d 162 (1966). This same standard of review is used in our review of a Commission rate determination. See Systems-Fuels, Inc. v. United States, 642 F.2d 112 (5th Cir. 1981).
 
 
 35
 The judicial deference that is accorded to a Commission action of the present nature is attributable to the fact that "the courts have always recognized that Congress intended to commit to the Commission the determination, by application of an informed judgment to existing facts, of the existence of forbidden preferences, advantages and discrimination." United States v. Chicago Heights Trucking Co., 310 U.S. 344, 352-53, 60 S.Ct. 931, 936, 84 L.Ed. 1243 (1940). The broad discretion thus accorded to the I.C.C. in these cases has long been recognized as necessary to the types of value judgments therein involved:
 
 
 36
 Whether a preference or advantage or discrimination is undue or unreasonable or unjust is one of those questions of fact that have been confided by Congress to the judgment and discretion of the Commission ... and upon which its decisions, made the basis of administrative orders operating in future, are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits or for some other reason amount to an abuse of power.
 
 
 37
 Manufacturers' Ry. Co. v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 389, 62 L.Ed. 831 (1918).
 
 
 38
 The "narrow scope within which Congress has confined judicial participation" in the Commission's rate determinations is attributable to the fact that "(t) he process of rate making is essentially empiric ... fluid and changing ... (involving) factors that must be valued as well as weighed." Congress has, therefore, given the Commission "the duty of being responsive to the dynamic character of transportation problems." Board of Trade of Kansas City v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 372, 86 L.Ed. 432 (1942).
 
 C. The Actual Common Control Standard
 
 39
 In adopting the actual common control standard, the Commission swept away a presumption of network common control that it used for many years to impose strict liability on carriers based on their participation in joint rates and the presence of interconnecting rail lines. We must now determine, within the narrow scope of review that we have, whether the Commission acted properly in abolishing this former presumption and in adopting, instead, a test that centers on factual issues that determine whether the carrier participated in the actual control of the disparate joint rate claimed to be discriminatory.
 
 
 40
 When we considered a Commission change in policy in the context of railroad mergers, we stated that "it is established beyond argument that an agency may change its policies so long as it identifies and articulates its reasons for doing so." Missouri-Kansas-Texas Railroad Company v. United States, 632 F.2d 392, 403 (1980), cert. denied, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981). Our opinion in Missouri-Kansas-Texas echoed that of the Supreme Court in American Trucking Associations, Inc. v. Atchison, Topeka, and Santa Fe Railway Company, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), in which the Commission had changed its former interpretations and then argued, much as the Commission does in the present case, that its past interpretation was based on an erroneous interpretation of principles enunciated by various judicial decisions. The Supreme Court did not, however, rest its analysis of the propriety of the Commission change in interpretation on the Commission's argument that its own prior decisions in a course of twenty-five years were erroneous. Rather, instead it specifically recognized the ability of the Commission to change its mind and to change its prior interpretations:
 
 
 41
 (T)he Commission, faced with new developments or in light of consideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice.... Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adopt their rules and practices to the Nation's needs in a volatile, changing economy.
 
 
 42
 387 U.S. at 416, 87 S.Ct. at 1618.
 
 
 43
 Our principal concern, then, is to determine whether the Commission has observed the statutory limits that Congress has set for its discretion, and that the Commission has exercised such discretion and has explained its departure from previous policy so that a reviewing court may determine that the decision is reasoned and not arbitrary. Burlington Truck Lines v. United States, 371 U.S. 156, 167-68, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); Missouri-Kansas-Texas Railway Company v. United States, 632 F.2d 392, 403 (1980), cert. denied, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981).
 
 
 44
 Applying the criteria set forth above, we first note that, under section 10741(b) of the Act, Congress gave the Commission a mandate "to protect persons, places, ports, or traffic types from unreasonable discrimination. This duty was reiterated in transportation policy sections of the revised Interstate Commerce Act 49 U.S.C. 10101." Corpus Christi II, 364 I.C.C. at 276. "Whether a discrimination in rules or services of a carrier is undue or unreasonable has always been regarded as peculiarly a question committed to the judgment of the administrative body, based upon an appreciation of all the facts and circumstances affecting the traffic." New York v. United States, 331 U.S. 284, 347, 67 S.Ct. 1207, 1240, 91 L.Ed. 1492 (1947). Despite the petitioners' claims to the contrary, Congress has never sanctioned the "network common control" standard, nor is there any semblance of Congressional intent that such standard be frozen into the administrative process of determining whether joint rates are discriminatory.[9] Thus, the Commission's abolition of the network common control presumption, and its new practice of requiring proof of actual joint control, is not shown to be a matter not entrusted to the Commission's sound discretion.
 
 
 45
 Likewise, the Commission clearly explained its departure from previous policy so that we may determine whether its decision is arbitrary and not irrationally founded. The Commission provided extended discussions of the actual common control standard in both Wheat cases, in its Federal Register announcement of reopening of the Corpus Christi I cases, and in the Corpus Christi II decision itself. The Commission explained that its network common control standard was tantamount to a presumption that imposed strict liability on carriers for the existence of rate disparities. The Commission now wishes to abandon the network common control standard, and adopt a standard that will impose liability only when there is actual control, to accord with actual fact rather than resulting from an arbitrary presumption.
 
 
 46
 Thus, the Commission has determined upon an analysis to be utilized that it deems to be appropriate for the decision of discriminatory rate protests, a matter within its statutory authority. The adoption or change of a method of analysis to be used in the administrative decision of such matters is not shown to be beyond the discretion entrusted to the Commission in its administration of matters statutorily regulated by it. The Commission has clearly articulated a non-arbitrary basis for the method of analysis adopted by it. Finding these criteria are met, judicial review extends no further. We affirm the order in question.
 
 
 47
 The petitioners produce seemingly endless arguments about the "evils" of the actual control standard. All of these arguments, however, assume that our court may engage in broad review and substitute its judgment for that of the well-reasoned decision of the Commission. We may not.
 
 
 48
 II. The Procedural Attack upon the 1980 Corpus Christi II Vacation of the 1954 and 1961 Corpus Christi I Decisions.
 
 
 49
 In 1979, the Commission reopened the 1954 and 1961 Corpus Christi I decisions to determine whether they should be modified and to consider whether the Commission should move from a conclusive presumption of network common control to an analysis of actual control as had been previously discussed in Wheat II. The Commission did so after service and after publication of notice (see note 7), in procedures that fully complied with the rule-making requirements of the Administrative Procedure Act. See Corpus Christi II, 364 I.C.C. at 271-72. Ultimately, the reopening led to the Commission's 1980 Corpus Christi II, which not only adopted the new actual control standard (see Part I of this opinion), but also to vacation of the Corpus Christi I 1954 and 1961 decisions.
 
 
 50
 The petitioners mount a procedural attack upon the vacation of these prior orders. They contend that in the 1980 re-opening of the Corpus Christi I case, the Commission should have proceeded by adjudication and not by rulemaking and that the vacation of the Corpus Christi I orders were improper. We find no merit to these contentions.
 
 
 51
 The choice between rulemaking and adjudication "is one that lies primarily in the informed discretion of the administrative agency." S. E. C. v. Chenery Corporation, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). The Commission is given rulemaking power in section 10321 of the Act,[10] and the Commission may choose to use its rulemaking power as long as it does not abuse its discretion in so doing.
 
 
 52
 The Commission argues, and we accept, that rulemaking was particularly appropriate in this case because the purpose of re-opening the Corpus Christi I cases was to consider the adoption of a new standard of common control that would transcend the interests of the particular petitioners and carriers originally involved in the Corpus Christi I cases. Further, the petitioners have not shown any harm as a result of the agency decision to proceed by rulemaking.
 
 
 53
 The Commission was entirely reasonable in giving all interested parties an opportunity to comment on agency policy and the Commission did not abuse its discretion in deciding to proceed by rulemaking.
 
 
 54
 Similarly, the Commission did not act improperly in vacating the Corpus Christi I orders. The Commission has authority to reopen cases at any time, and the petitioners' claim that the cases should not be reopened simply because they were decided 18 and 25 years ago is without merit. Cf., American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 540, 90 S.Ct. 1288, 1293, 25 L.Ed.2d 547 (1970). The Commission's vacation of the earlier continuing orders that conflicted with its new policy may reasonably be considered an appropriate method within the Commission's discretion by which it could implement its adoption of the new actual common control standard.
 
 
 55
 The petitioners' claim that the vacation was improper because it imposes retroactive liability is mistaken, because no retroactive liability was imposed. The original Corpus Christi I orders applied prospectively, and the only effect of the adoption of the new standard of actual common control is to permit unequalized rates in the future where no actual common control in fact exists. (If such unequalized rates are in fact proposed, the petitioners of course still have adequate remedy to protest them upon any grounds accorded by law.)
 
 
 56
 The petitioners' final claim that the Commission should not have vacated the orders without determining whether common control to Corpus Christi exists under the new standard is without merit. As the Commission points out, the effect of vacation is not to change rates currently on file. If carriers subsequently initiate rate changes, they can be examined on an individual basis.
 
 Conclusion
 For the reasons stated:
 
 57
 (1) We DISMISS petitions in our docket nos. 78-1348, 79-1816, and 80-1842, which attack the Wheat adjudications that rejected Corpus Christi claims of discriminatory rates, as MOOT.
 
 
 58
 (2) We AFFIRM the orders complained of by the petition in our docket no. 80-1843, finding that these orders, (a) adopting the new actual control standard and (b) reopening and vacating the 1954 and 1961 Corpus Christi I orders, were procedurally proper and within the Commission's authority and discretion.
 
 
 59
 DISMISSED AS MOOT IN PART; AFFIRMED IN PART.
 
 APPENDIX
 
 60
 The consolidated proceedings before us result from four petitions for review of Interstate Commerce Commission, ("the Commission" or "the I.C.C.") orders:
 
 
 61
 1. Our docket number 78-1348, being a petition filed by the Nueces County Navigation District No. 1, Corpus Christi ("Nueces County"), a political subdivision of the State of Texas, which seeks review of a report and order of the Commission dated December 19, 1977, Wheat, Oklahoma and to Kansas to Texas Gulf Ports, I.C.C. docket no. 36491 (Sub-No. 1), 357 I.C.C. 382 (1977), a decision that held that the reduced rates of wheat from points in Oklahoma and Kansas to various Texas ports was not unduly preferential to them nor prejudicial to the Corpus Christi port. We will refer to this decision as Wheat I.
 
 
 62
 2. Our docket number 79-1816, a petition by Nueces County and by Producers Grain Corporation ("Producers Grain"), a regional grain marketing association of Amarillo, Texas, which seeks review of an I.C.C. decision of February 2, 1979, Wheat, Oklahoma and Kansas to Texas Gulf Ports, I.C.C. docket no. 36491 (Sub-No. 1), 359 I.C.C. 592 (1979), which (after reopening Wheat I ) reaffirmed its action on a broader basis. We will refer to this decision as Wheat II.
 
 
 63
 3. Our docket number 80-1842, another petition by Nueces County and by Producers Grain, which seeks review of an I.C.C. decision dated July 21, 1980, Nueces County Nav. Dist. No. 1 v. Abilene & Southern Ry. Co., I.C.C. docket no. 31098 (but also embracing I.C.C. docket nos. 33447 Nueces County Nav. Dist. v. Atchison, T & S.F. Ry., and 36491 (Sub-No. 1), Wheat, Oklahoma and Kansas to Texas Gulf Ports ), 364 I.C.C. 269 (1980)), a decision that:
 
 
 64
 (a) vacated earlier orders in I.C.C. docket nos. 30918, Nueces County Navigation District No. 1 v. Abilene and Southern Railway Company, 291 I.C.C. 459 (1954), and in docket no. 33447, Nueces County Navigation District v. Atchison T & S.F. Railway Company, 315 I.C.C. 155 (1961)-to be referred to as the "Corpus Christi I " cases. These previous decisions had held joint rail rates discriminatory as to Corpus Christi based upon the Commission's former presumed "common control" rule;
 
 
 65
 (b) held that a new "actual control" (of a discriminatory rate) standard, adopted in the opinion, shall be used in the determination of unreasonable discrimination in future challenges to carrier rate adjustments to the ports in these proceedings instead of a former presumed "common control" of joint rates that were discriminatory; and
 
 
 66
 (c) affirmed the decision in Wheat I and II, supra, insofar as it applied the actual control analysis, but modified its discussion relative to rate prescription in the absence of common control. We will refer to this decision as Corpus Christi II.
 
 
 67
 By this petition for review, Nueces County and Producers Grain reiterate their objections to the holdings in Wheat I and II, and reaffirmed in Corpus Christi II, that the reduced rail rates of wheat to various Texas ports were not discriminatory to the Corpus Christi port.
 
 
 68
 4. Our docket number 80-1843, is yet another petition by Nueces County and by Producers Grain that seeks review of the same July 20, 1980 I.C.C. decision, Corpus Christi II, supra, but which in this instance attacks the reopening of the earlier 1954 and 1960 Nueces County decisions (the (a) holding above), and also attacks the decision's adoption of the new "actual control" standard in the above (b) portion of the ruling.
 
 
 69
 A number of parties have intervened in the proceedings before us.
 
 
 70
 In support of the respondent Commission, the following rail carriers intervened: The Missouri Pacific Railroad ("MoPac"); the Southern Pacific Transportation ("Southern Pacific"); the Atchison, Topeka & Santa Fe Railway Company ("Santa Fe"); and Burlington Northern Inc. (successor in interest to the St. Louis-San Francisco Railway Company-the "Frisco" Railway). Houston Port Bureau, Inc., also intervened in support of the respondent Commission's orders.
 
 
 71
 The Bunge Corporation and the Louis Dreyfus Corporation ("Dreyfus") intervened in support of the petitioners, Nueces County and Producers Grain.
 
 
 
 [1]
 In Wheat II, the Commission discussed in detail how the actual common control-good faith offer of divisions test operates
 According to the Commission, "the protestant has the initial burden of proving that the originating carrier could serve both the preferred and prejudiced parts either by itself or by means of connecting carriers, acting as a network or otherwise." 359 I.C.C. at 603. In Wheat II, the Commission noted that Frisco serves the preferred ports directly and can serve Corpus Christi indirectly by means of Southern Pacific or MoPac. Id.
 Once the protestant has satisfied its burden of showing that the origin carrier could serve both points, the burden shifts to the origin carrier (or to the connecting carriers if they too, have actual control, see 364 I.C.C. at 275) to rebut the protestant's evidence of common control by showing that the respondent has made a good faith offer of division of revenues to the connecting carriers, but was unsuccessful in obtaining a concurrence. If the respondent can show that it did make this good faith offer, the Commission contends, "it demonstrates that (the origin carrier) has no actual control of the rates to the ports which it does not serve directly." 359 I.C.C. at 603.
 
 
 [2]
 In the Wheat adjudications, the Commission likewise rejected the protestant's alternative request that, even if common control be found absent, the Commission could prescribe non-discriminatory rates to Corpus Christi pursuant to 49 U.S.C. § 10704(a)(1), former Section 15(1) of the Interstate Commerce Act. This provision authorizes the Commission, inter alia, to prescribe a rate (including a maximum or minimum rate) if, after hearing, it decides that a carrier's rate violates the Interstate Commerce Act as recodified, Subtitle IV, 49 U.S.C. §§ 10101 et seq. The Commission found that, absent Frisco's control of the disparate rates to Corpus Christi, no discriminatory-rate violation of the statute was proved
 Prescription of a rate under section 10704 differs from the issuance of an alternative order under section 10741(b) in that, as the Commission interprets section 10704, the latter is a remedial section that requires violation of some substantive section of the Act as a predicate for rate prescription. (Of course, if the Commission had found unreasonable discrimination under § 10741(b), a substantive violation, that would have justified issuance of a rate-prescription; but it did not.) On the other hand, issuance of an alternative order is a specific response to a violation of section 10741(b), prohibiting unreasonable rate discrimination.
 No claim was made in the present proceedings that Frisco's rates were "unreasonable" or violated the statute other than being unreasonably discriminatory to Corpus Christi, a contention rejected by the Commission. The Commission expressly noted that its present decision(s) did not preclude the Corpus Christi interests from further proceedings under § 10704 that raised such issue.
 In view of our determination that the petitions to review the Wheat holdings are moot, we do not reach this issue. See also note 6, infra.
 
 
 [3]
 These petitions are our docket nos. 78-1348, 79-1816, and 80-1842. The remaining petition, our docket no. 80-1843, raises still viable issues. See appendix to this opinion
 
 
 [4]
 Before the Commission, where petitioners conceded that Wheat I and Wheat II were moot for the reason noted, they also contended that the proper remedy was to vacate these decisions rather than to dismiss them, as was suggested also in oral argument before us. Whatever merit this procedural approach to mootness has where issues of res judicata are implicated, see United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), the policies there involved do not apply here; for, among other reasons, the non-moot Corpus Christi II, see infra, itself vacated the Corpus Christi I decisions and itself established the new precedential rule concerning "common control" (the harms sought to be avoided by petitioners in having Wheat I vacated instead of dismissed)
 
 
 [5]
 Section 10741(b) provides in full:
 A common carrier providing transportation or service subject to the jurisdiction of the Commission under Chapter 105 of this title (49 U.S.C. §§ 10501 et seq., the 1978 recodification of the Act) may not subject a person, place, port, or type of traffic to unreasonable discrimination. However, subject to subsection (C) of this section, this subsection does apply to discrimination against the traffic of another carrier providing transportation by any mode.
 In an Act of October 17, 1978, 92 Stat. 1337, Congress recodified and simplified the language of the Interstate Commerce Act. Section 10741(b) replaces the former section 3(1) of the Act. Section 3(1) forbade "undue or unreasonable preference or advantage," while 10741(b) forbids "unreasonable discrimination." The recodification was expressly intended to effect no substantive change in the Interstate Commerce Act. The Commission has stated in one of the decisions in the present appeal that "(b)ecause there is no substantive change in the law under the recodified statute and because many of the court and Commission decision (sic) arose under the former act, we shall use interchangeably sections 3(1) and 10741 and the terms "unreasonable discrimination" and "undue preference and prejudice." Nueces County Navigation District No. 1 v. Abilene & Southern Railway Company, 364 I.C.C. 269, 270 n. 3 (1980) (Corpus Christi II ). The petitioners concede that the revision made no substantive change in the Act.
 
 
 [6]
 The petitioners argue that the later decisions of Ayrshire Collieries Corporation v. United States, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243 (1949) and New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947) somehow modified the holdings in Central Railroad and Texas & Pacific Ry. Co., supra, that an alternative order to end rate-discrimination may not be issued unless the carrier(s) effectively participated in the discriminatory joint rate. We reject this contention. As the Commission noted, Wheat II, 359 I.C.C. at 597-98, these decisions explicitly did not refer to a situation where an alternative order is the appropriate relief. See, e.g., Ayrshire, supra, 335 U.S. at 593-94, 69 S.Ct. at 289
 A stronger argument is made by the petitioners, however, that these decisions indicate that, even if an alternative order is not appropriate, the Commission is entitled to prescribe rates if the joint rates are unreasonably discriminatory (i.e., even in the absence of joint control). We have previously noted that the mootness of the Wheat adjudications precludes our reaching the specific demand for prescribed rates in those cases. See note 2.
 Nevertheless, we recognize that a strong argument could be made that the Commission's view as to when rate-prescription is appropriate (rather than an alternative order) in discriminatory rate cases, as enunciated in Wheat I and Wheat II, could be regarded as non-moot rule-making in Corpus Christi II ; there, in reaffirming the Wheat cases, the Commission specifically modified its Wheat "discussion of rate prescriptions in the absence of common control." 364 I.C.C. at 279. We decline to so characterize the Wheat rate-prescription "discussion" and its modification in Corpus Christi II. While it is difficult to disagree in the abstract with the Commission's view that under present circumstances Ayrshire and New York do not permit rate prescription unless a rate is both unreasonable and discriminatory-and that a rate cannot be discriminatory under the statute unless the carrier effectively participates in it-we do not feel it appropriate to rule upon the propriety of the Commission's views on the matter upon a record devoid of factual data suggesting how the rates at issue could be unreasonably discriminatory in violation of section 10741(b), even though no individual rate at issue is either unreasonable or a violation of section 10741(b).
 
 
 [7]
 The notice published at 44 Federal Register 67558-559 (No. 228, November 26, 1979), stated that the Commission was reopening the Corpus Christi I decisions and invited briefs and comments. The notice provided:
 Summary : The above-captioned cases (the Corpus Christi cases) are being reopened to determine if the port equalization orders entered in these proceedings should be modified. As the orders presently exist, the carriers are required to maintain equivalent rates to both the Houston area ports and Corpus Christi. The orders were entered partly on the basis of the railroads' ability to control the rates to the Gulf ports. Our reexamination of these cases will be limited to the issue of actual control of rates to the Gulf ports and how control of these rates influences the Commission's authority to order relief in cases arising under 49 U.S.C. 10741. We will focus on situations where carriers cannot agree on rate policies and, as a result, concurrences to joint rate changes cannot be secured. We will also explore the circumstances, if any, in which a violation of 49 U.S.C. 10741 might exist if common control of rates is not found when unequal rates are proposed to the Gulf ports. We believe this action is necessary to appropriate regulation in this area.
 Supplemental Information : Our purpose in reopening the Corpus Christi cases is to determine whether these outstanding port equalization orders require modification to recognize current rate-making situations not contemplated when the outstanding orders were issued....
 We are considering moving from a conclusive presumption of network common control to an analysis of actual control over the joint rates. The principal test of actual control which we are considering is discussed in Wheat, Oklahoma and Kansas to Texas Gulf Ports, 357 ICC 382 (1977), 359 ICC 592 (1979) (Wheat II ), which is presently pending on court appeal.
 An extended analysis of actual common control is a departure from past Commission decisions and directly affects the operation of the Corpus Christi orders. Accordingly, it is necessary to reopen these proceedings and receive comments. Participants should comment on the appropriate legal analysis of the issue of rate control in cases arising under 49 U.S.C. § 10741. Commentors should also address the question of, under what circumstances, if any, unequalized rate proposals should be found to violate § 10741 when there is no common control.
 
 
 [8]
 The Commission noted, however, Corpus Christi II, 364 I.C.C. at 270:
 This limiting of the issues to only one of the criteria under section 10741(b) was not and is not intended to detract from the importance the Commission places on the other three criteria. The fourth factor, similarity or disparity in transportation conditions, continues to be our primary consideration. It is axiomatic that there can be no discrimination if economic and operational analysis proves that different rates are appropriate. This analysis includes review of matters such as the different distances involved, alternative routings available, differences in the cost of service, and, especially, any differences in competitive conditions.
 
 
 [9]
 Notwithstanding the broad discretion that is necessarily accorded to the Commission in these cases, the petitioners offer two arguments to show that the adoption of the actual common control is contrary to legislative intent
 First, the petitioners argue that Congress adopted the "network" common control analysis because it made certain amendments to the Act after various alleged "network" common control were decided, and did not challenge "network" control analysis. Even if we are to assume that the cases that the petitioners cite were true "network" common control cases, we cannot accept the petitioners' argument that all former administrative policy, practice, and regulation are, in effect, "frozen" every time Congress amends or enacts a statute without disputing the current corpus of agency jurisprudence.
 Second the petitioners claim that Section 202(f) of the Railroad Revitalization and Regulatory Reform Act of 1976, (the "4R Act"), 49 U.S.C. § 10711, precludes the Commission from changing its policy. Section 10711, provides that ratemaking amendments in the 4R Act should not be construed to modify the application of Section 10741(b). The petitioners conclude from this that Congress impliedly adopted the "network" common control analysis, thus precluding agency abolition of the "network" common control presumption.
 There is nothing in the 4R Act to indicate that Congress wished to do anything to upset Commission discretion in discrimination cases; rather, Section 10711 provides only that the 4R Act is not meant to affect the discrimination statute. In addition, although section 101(b)(3) of the 4R Act was not included when the Interstate Commerce Act was recodified in 1978, it is nevertheless helpful in interpreting the effect of the 4R Act generally. Section 101(b)(3) of the 4R Act provides that Congress intended to "permit railroads greater freedom to raise or lower rates for rail services in competitive markets." Abolishing the "network" common control presumption certainly tends to effect that policy.
 
 
 [10]
 Section 10321 states: "The Commission may prescribe regulations in carrying out this subtitle."